**Stanley PYZYNSKI, Appellee,**

**v.**

**NEW YORK CENTRAL RAILROAD COMPANY, Appellant.**

**No. 143, Docket 33569.**

United States Court of Appeals, Second Circuit.

Argued Oct. 15, 1969.

Decided Feb. 2, 1970.

John E. Leach, Buffalo, N. Y. (Brown, Kelly, Turner, Hassett & Leach, Paul M. Hassett, Jr., Buffalo, N. Y., of counsel), for appellant.

Fenton F. Harrison, Buffalo, N. Y. (Harrison, Gruber & Gaughan, Buffalo, N. Y., of counsel), for appellee.

Before FRIENDLY, HAYS and ANDERSON, Circuit Judges.

HAYS, Circuit Judge.

The New York Central appeals from a judgment entered against it in the Unit-

ed States District Court for the Western District of New York after a jury trial in an action for back pay instituted by Stanley Pyzynski.

In November 1959, Pyzynski, an employee of the New York Central, was injured in the course of his employment. Claiming permanent and total disability, Pyzynski brought suit against the Railroad and another party on whose property the accident occurred. This suit resulted in a vedict in his favor.[1] Thereafter, in December 1961, Pyzynski, feeling himself sufficiently recovered to return to work, applied for and was granted a physical examination by one of the Railroad's doctors. Although the examining physician found appellee fit for train service, the Railroad's medical director ruled against returning him to work.

Pyzynski, a member of the Brotherhood of Railroad Trainmen, consulted with Brotherhood officials concerning the action of the Railroad, and the Broth-

erhood instituted grievance procedures on appellee's behalf. Negotiations passed through the various stages, finally culminating in the presentation of Pyzynski's case to the Special Board of Adjustment No. 387, a system board created by agreement between the Brotherhood and the Railroad pursuant to Section 153, Second, of the Railway Labor Act.[2] On December 3, 1963, the Board ruled that appellee should be examined by a board of three doctors and, if found physically fit, that he be restored to train service and compensated at the applicable job rate from May 10, 1962 until the date of his return to work. The result of this medical examination was unfavorable to appellee. However, in January 1965, upon petition of the Brotherhood, the Board reopened the case and issued what was termed a "ruling on interpretation," [3] directing a reexamination of appellee by a neutral physician. This ruling was based on a finding that the Railroad had improper-

1. The jury returned a verdict of $70,000 which was later settled for the sum of $65,000.

2. 45 U.S.C. § 153 Second (1964).
   As this action was commenced in December 1965, all references to Section 153 of the Act, unless otherwise indicated, are to that section as it existed before amendment in 1966. The appropriate citation is Ch. 691, § 3, 48 Stat. 1189 (1934).
   Before amendment in 1966, Section 153 Second of the Act read as follows:
   "Nothing in this section shall be construed to prevent any individual carrier, system, or group of carriers and any class or classes of its or their employees, all acting through their representatives, selected in accordance with the provisions of this chapter, from mutually agreeing to the establishment of system, group, or regional boards of adjustment for the purpose of adjusting and deciding disputes of the character specified in this section. In the event that either party to such a system, group, or regional board of adjustment is dissatisfied with such arrangement, it may upon ninety days' notice to the other party elect to come under the jurisdiction of the Adjustment Board."
   The agreement establishing Special Board of Adjustment No. 387 provided

that its decisions would have the same effect as decisions by the National Railroad Adjustment Board. Section 153 First creating the National Railroad Adjustment Board provided in subdivision m that the awards of that Board "shall be final and binding upon both parties to the dispute, except insofar as they contain a money award." In addition, the agreement establishing the Special Board explicitly stated that its awards would be "final and binding upon both parties to the dispute."
   In 1966, Section 153 Second was amended to provide explicitly that awards of system boards of adjustment shall be final and binding upon both parties to the dispute. 45 U.S.C. § 153 Second (Supp. IV 1965–68).

3. Paragraph 10 of the agreement establishing the Special Board provided:
   "In case a dispute arises involving an interpretation of an award while the Board is in existence or upon recall within ninety days thereafter, the Board, upon the request of either party, shall interpret the award in the light of the dispute."
   Similar language is contained in subdivision (m) of Section 153 First of the Act.

ly submitted to the doctor who first examined Pyzynski information concerning Pyzynski's prior testimony in his personal injury action as to his total incapacitation. The Railroad objected to the reopening of the case and refused to honor the ruling on interpretation.

Thereafter, numerous discussions and exchanges of correspondence took place between the Railroad and the Brotherhood and the Brotherhood and Pyzynski. Although there is considerable dispute as to what settlement Pyzynski authorized the Brotherhood to make, the upshot of these negotiations was that the Brotherhood and the Railroad agreed that if Pyzynski could pass a physical examination he could return to work, but without back pay. Appellee finally passed this examination and returned to work in July 1965.

In December 1965, appellee instituted this suit in the United States District Court for the Western District of New York to enforce the award of the Special Board, seeking specifically to enforce that part of the award which directed the Railroad to compensate Pyzynski for back pay for the period from May 10, 1962 until the date of his return to work. Trial of the action resulted in a verdict for appellee, and it is from the judgment entered upon this verdict that the Railroad appeals.

On appeal, the Railroad contends that it was error to submit to the jury the question of the Brotherhood's authority to compromise and settle appellee's claim for back pay. We hold that the Brotherhood, as Pyzynski's collective bargaining agent, was, as a matter of federal law, vested with authority to make such a settlement, and, accordingly, we reverse the decision of the district court.

## I.

Preliminarily, we are met with appellant's contention that the district court had no jurisdiction to hear this action, since it was founded on an award of a system board of adjustment. In support of this contention appellant points out that while Section 153 First (p) of the Railway Labor Act [4] specifically empowered the district courts to enforce awards of the National Railroad Adjustment Board, Section 153 Second, as it existed at the time of the commencement of this action, did not similarly authorize enforcement of system board awards.

We are convinced, however, that Congress did not intend such a truncated interpretation of Section 153 Second. One of the major purposes of the Railway Labor Act is to provide for "the prompt and orderly settlement of all disputes growing out of grievances." 45 U.S.C. § 151a (1964). It was in order to promote such settlements that Congress authorized carriers and collective representatives to agree to the establishment of system adjustment boards. The policy of encouraging the creation of such boards, however, would fail

4. Section 153 First (p) provided:
  "If a carrier does not comply with an order of a division of the Adjustment Board within the time limit in such order, the petitioner, or any person for whose benefit such order was made, may file in the District Court of the United States for the district in which he resides or in which is located the principal operating office of the carrier, or through which the carrier operates, a petition setting forth briefly the causes for which he claims relief, and the order of the division of the Adjustment Board in the premises. Such suit in the District Court of the United States shall proceed in all respects as other civil suits, except that on the trial of such suit the findings and order of the division of the Adjustment Board shall be prima facie evidence of the facts therein stated, and except that the petitioner shall not be liable for costs in the district court nor for costs at any subsequent stage of the proceedings, unless they accrue upon his appeal, and such costs shall be paid out of the appropriation for the expenses of the courts of the United States. If the petitioner shall finally prevail he shall be allowed a reasonable attorney's fee, to be taxed and collected as a part of the costs of the suit. The district courts are empowered, under the rules of the court governing actions at law, to make such order and enter such judgment, by writ of mandamus or otherwise, as may be appropriate to enforce or set aside the order of the division of the Adjustment Board."

in its essential purpose if the legal sanctions available for the awards of such system boards were not coextensive with those available for awards of the National Board. Otherwise, with each party free to ignore the system board's decision, submitting a dispute to it would accomplish little more than would informal negotiations and would indeed represent a most unattractive alternative to the National Board. Without some specific indication in the statute that Congress intended that an award of a system board created pursuant to Section 153 Second would not be enforceable according to the procedures particularized in Section 153 First, we are not willing to attribute to Congress the intention to engage in such a futile legislative exercise.

█ We find support for this interpretation of Section 153 Second in the Supreme Court's decision in International Ass'n of Machinists, AFL–CIO v. Central Airlines, Inc., 372 U.S. 682, 83 S.Ct. 956, 10 L.Ed.2d 67 (1963). In that case, the Court, finding no reason to believe that Congress intended to discard "an element essential to a reliable system of settling disputes under existing contracts," id. at 695, 83 S.Ct. at 963, held that the federal courts had jurisdiction to enforce awards made by airline system adjustment boards. It is true that in that case the air carriers and the collective representatives were under a specific statutory duty to establish such boards. However, in our opinion, the reasoning of that case is no less applicable here where the establishment of the railroad system boards was affirmative-

ly encouraged. We therefore conclude, as did the Court in *International Ass'n of Machinists*, that on the basis of the Act and its purposes, Congress must have "intended the Board to be and to act as a public agency, not as a private go-between; its awards to have legal effect, not merely that of private advice." [5] Therefore, although Section 153 Second contained no explicit grant of jurisdiction to the federal courts to enforce awards of voluntary system boards, we hold that such jurisdiction exists by implication from Section 153 First.[6]

## II.

Having found that a proper basis for federal jurisdiction exists, we turn to a consideration of the appellant Railroad's contention that Pyzynski's claim for enforcement of the Special Board's award was effectively extinguished by settlement between the parties. The court below determined that the adequacy of this contention as a defense depended on whether Pyzynski had authorized the Brotherhood to act for him in settling his claim. This question was submitted to the jury, and the jury found that the Brotherhood was not so authorized. The Railroad, however, urges that it was not proper to submit this issue to the jury. We are thus presented with the question, central to the disposition of this case, as to the nature and scope of the Brotherhood's authority to settle Pyzynski's grievance.

█ The Railway Labor Act imposes on carriers and unions alike the affirmative duty to negotiate in good faith for the settlement of grievances, 45 U.S.C.

5. 372 U.S. at 695, 83 S.Ct. at 964, quoting Washington Terminal Co. v. Boswell, 75 U.S.App.D.C. 1, 124 F.2d 235, 244 (1941), aff'd, 319 U.S. 732, 63 S.Ct. 1430, 87 L.Ed. 1694 (1944).

6. The 1966 amendments to the Railway Labor Act have made specific the grant of jurisdiction to the district courts to enforce the awards of voluntary system adjustment boards by providing that:
   "Compliance with such awards shall be enforceable by proceedings in the United States district courts in the same man-

ner and subject to the same provisions that apply to proceedings for enforcement of compliance with awards of the [National Railroad] Adjustment Board." 45 U.S.C. § 153 Second (Supp. IV 1965–68).
   There is nothing in the history of the amendment of this section which would lead one to believe that Congress intended by this particularization to grant jurisdiction where none had existed before. See 1966 U.S.Code Cong. & Adm.News, p. 2285 et seq.

§ 152 (1964); Virginia Ry. Co. v. System Federation No. 40, 300 U.S. 515, 548, 57 S.Ct. 592, 81 L.Ed. 789 (1937).[7] In Elgin, J. & E. R. Co. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945), opinion adhered to, 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946), railway employees contested their union's authority either to settle individual claims or to submit them to the National Railroad Adjustment Board without specific authorization to do so. Relying on several provisions in the Railway Labor Act which in the Court's view contemplated the participation of an aggrieved employee in settlement procedures, the Court in *Burley I* rejected the contention that the collective agent had the same exclusive authority to settle grievances as it did to negotiate and conclude agreements concerning major disputes. The Court held that before the collective agent could affect an employee's individual rights, "more must be shown than that the collective agent appeared and purported to act for him. It must appear that in some legally sufficient way he authorized it to act in his behalf." 325 U.S. at 738, 65 S.Ct. at 1297. Upon rehearing, however, in explaining its holding in *Burley I*, the Court limited the rather broad implications of that decision. The Court said:

"[S]o far as union members are concerned, and they are the only persons involved as respondents in this cause, it is altogether possible for the union to secure authority in these respects within well established rules relating to unincorporated organizations and their relations with their members, by appropriate provisions in their by-laws, constitution or other governing regulations, as well as by usage or custom. There was nothing to the contrary in our former opinion. We

only ruled that on the showing made in this respect, which included controverted issues concerning the meaning and applicability of the union's regulations, and the effects of custom and usage, we could not say as a matter of law that the disputed authority had been given." 327 U.S. at 663, 664, 66 S.Ct. at 722 n. 2.

The Court added:

"It would be entirely inconsistent for the Act to require the carrier and the union to negotiate concerning the settlement of the grievance and, while withholding power from them to make that settlement effective finally as against the employee, to relieve him altogether of obligation in the matter. Not only is he required to take affirmative steps. His failure to do so may result in loss of his rights."[8] (Footnote omitted.) *Id.* at 665, 66 S.Ct. at 723.

And speaking of its first decision in Burley, the Court cautioned:

"[W]e did not rule, and there is no basis for assuming we did, that an employee can stand by with knowledge or notice of what is going on with reference to his claim, either between the carrier and the union on the property, or before the Board on their submission, allow matters to be thrashed out to a conclusion by one method or the other, and then come in for the first time to assert his individual rights." *Id.* at 666–667, 66 S.Ct. at 724.

■ The *Burley* decisions may be said to have held that a carrier may rely on the authority of a union to negotiate a conclusive settlement of an employee's grievance if it can be shown either that the union acted upon the basis of actual authority, whether individually given or

---

7. This duty applies to the negotiation of both major and minor disputes. Elgin, J. & E. R. R. Co. v. Burley, 325 U.S. 711, 725, 65 S.Ct. 1282, 89 L.Ed. 1886 and n. 18 (1945).

8. The Court noted that "Even the ordinary law of agency attributes authority to a

representative to act when the principal stands by with knowledge or notice of his assumption of that authority and permits the third person to act to his injury upon the same assumption." 327 U.S. at 665, 66 S.Ct. at 723, n. 7.

to be gathered from the union constitution or by-laws or from custom and usage or that the employee had notice or knowledge of the actions taken by the union in his behalf and took no steps to negate the union's authority.

Turning to evidence adduced at trial in the present case we find that after the Railroad refused to recognize the second award of the Special Board, Pyzynski's case was the subject of discussion at a meeting of a number of Brotherhood officers on May 8, 1965. The Local Chairman of the Brotherhood, Mr. Herr, discussed the result of this meeting with Pyzynski and procured from Pyzynski an authorization for settlement at no less than 50% of back pay. A report of this discussion and the signed authorization were embodied in a letter sent by Herr on May 10, 1962 to Mr. Weil, the Vice-President of the Brotherhood and Mr. Kenefick, the General Chairman.

Several days later, however, Pyzynski wrote a personal note to Kenefick. The letter shows that Pyzynski was by now quite desperate to get back to work, and he requested "If you can get *any kind* of settlement please do so. Get me back to work." This statement, especially when read in the context of the entire letter, could quite reasonably be interpreted as evincing Pyzynski's intention to withdraw all conditions previously attached to the authority given the Brotherhood to settle.[9] On the witness stand, however, Pyzynski asserted that he had not meant to abandon the condition that he receive 50% of back pay.

Following the receipt of this letter, Weil wrote to Herr and Pyzynski, suggesting that the conflict between Pyzynski's two statements be resolved by sending to Weil and Kenefick the following telegram over Pyzynski's signature: "I am agreeable to accepting an offer for return to service, without any restrictions, without, repeat, without pay for time lost provided such settlement can be negotiated." A telegram to this effect was subsequently prepared and sent.[10] Although Pyzynski admitted to receiving the letter requesting the telegram, he testified that his subsequent authorization of the requested telegram was non-specific and contemplated only the sending of *a* telegram. In fact, he has persisted in insisting that at no time did he authorize the relinquishment of his claim for back pay.

In any event, following the receipt of this telegram, the Brotherhood met on May 21, 1965 with Mr. Fee, a vice-president of the Railroad. At this time, the Brotherhood offered in compromise that the Railroad permit Pyzynski to go back to work without back pay. The Railroad, on June 28, 1965, counterproposed that Pyzynski be accepted back to work without back pay if he could pass a physical examination. The Brotherhood agreed to settlement on these terms, and a medical examination was set for July 15. On that date, and prior to the medical examination, Pyzynski met with Kenefick and a representative of the Railroad. Kenefick testified that he explained the terms of the settlement to Pyzynski at that time, including the un-

9. The full text of Pyzynski's letter follows:
"Dear Sir and Brothers:
     As of the letter of May 10, I some more trouble. My wife had a nerves (sic) breakdown May 12. I had to take her to a hospital. I don't know how long she will there. The bills are over head and I don't know which to move. I have to get a loan on the house. She has been sick for the last three years. I talked to Mike Herr on the telephone and he said he tried to get in touch with you two or three times couldn't reach you. 'If you can get

*any kind of settlement* please do so.' Get me back to work. I am sorry for giving you all this trouble Joe. Thank you.
                    /s/ Stanley Pyzynski
Will you please answer me."

10. The final wording of the telegram sent was as follows:
     "I am agreeable to accepting an offer for return to service without any restrictions, without time lost provided such settlement can be negotiated
                    S. Pyzynski"

derstanding that "there was no lost time involved in the case," and that Pyzynski made no objection. Although the Railroad's representative did not recall that the terms of the settlement were discussed while he was present, he testified that on the basis of his conversations with Pyzynski he was left with the impression that Pyzynski was satisfied with the arrangement made. Once again, however, Pyzynski's testimony is in conflict. Indeed, he denied at trial that the terms of the settlement were ever explained to him.

The Railroad's evidence established that in its negotiations with the Brotherhood and its acceptance of the Brotherhood's proposal to reinstate Pyzynski without back pay it relied on the reasonable assumption that the Brotherhood was acting on Pyzynski's behalf.

■ From the outset, Pyzynski chose to press his grievance through the Brotherhood. At no time did he attempt to initiate personal negotiations with the Railroad. Thus the Railroad had the affirmative duty under the Act to negotiate with the Brotherhood for the final settlement of Pyzynski's grievance.

Following the Railroad's refusal to recognize the validity of the Board's second award, Pyzynski remained in fairly constant contact with the Brotherhood in regard to the status of his grievance. While he may not have had specific knowledge of each step in the negotiations, he must be held to have known throughout that the Brotherhood was negotiating with the Railroad on his behalf. He clearly acquiesced in the actions taken by the Brotherhood in pursuing a settlement. He presented himself for the physical examination that formed the basis for his return to work, and at that time appeared to the Railroad official present to be well satisfied with the settlement concluded.

■ Moreover, in establishing the reasonableness of its reliance on the representations of the Brotherhood that it spoke for the employee the carrier may show the basis upon which the Brotherhood purported to act. The *Burley* decisions recognize the need for mutual trust to enable the carrier and the union to carry out their joint responsibility in grievance negotiations. The standard formulated focuses not only on the indicia of authority manifested to the carrier, but also upon the indicia of authority upon which the union acts. Here the negotiations and correspondence between Pyzynski and the Brotherhood show that the Brotherhood had reasonable grounds for assuming it acted with Pyzynski's assent. We may assume that in its negotiations with the Railroad, the Brotherhood told the Railroad's representatives of its relationship with Pyzynski.

Not only did Pyzynski fail in the words of *Burley II*, "to take affirmative steps" to negate the Brotherhood's authority when he knew that the Railroad and the Brotherhood were negotiating a settlement of his claim, but he stood by "with knowledge or notice of what [was] going on" without indicating any disaffection from the Brotherhood's efforts.

### III.

Since 1946 when the second *Burley* opinion was handed down, there have been developments in federal labor law which serve further to illuminate the problems dealt with by the *Burley* decisions.

In the Court's view, certain procedural provisions of the Act were interpreted as going beyond a mere guarantee of the right to have notice and be heard in grievance proceedings. They were interpreted as contemplating "effective participation in the statutory procedures by the aggrieved employee." *Burley I, supra* at 325 U.S. 736, 65 S.Ct. at 1296. The Court believed that by giving the individual employee considerable leeway in pursuing his own grievance, the submergence of individual and minority interests under the collective will might be prevented. See *id.* at 733–736, 65 S. Ct. 1282. In the more than twenty years since the *Burley* decisions were announced, however, the urgency of so interpret-

ing these provisions has been considerably diminished.

A. One of the major concerns which led the *Burley* Court to interpret the Act as it did was the fact that the Act forbade any agreement creating a closed shop. *Burley I, supra* at 734, 65 S.Ct. 1282 n. 31. It was feared that cases would arise where the interests of an employee not a member of the union would be opposed or hostile to the collective interest of the union and its members and that in such situations the non-member employee's interest might be sacrificed. Since the Act made no special distinction between the procedure for settling member grievances and the procedure for settling non-member grievances, the Court felt it could not have been its purpose to vest in the union the exclusive power of settlement. *Burley I, supra* at 736, 65 S.Ct. 1282.

However, in 1951, the Act was amended to make it lawful for unions and carriers to enter into union security agreements. Thus in most instances today it is probable that an aggrieved employee will be a member of the union which purports to represent him.

B. The *Burley* case relied heavily on the theory that the individual employee could effectively champion his own cause. It is quite apparent today that the employee's only adequate protection lies in the negotiating skill and strength of his union. In Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) the Court said:

"The Railway Labor Act, in an attempt to aid collective action by employees, conferred great power and protection on the bargaining agent chosen by a majority of them. As individuals or small groups the employees cannot begin to possess the bargaining power of their representative in negotiating with the employer or in presenting their grievances to him."

See also Douds v. Local 1250, 173 F.2d 764, 770, 772, 9 A.L.R.2d 685 (2d Cir. 1949); Hughes Tool Co. v. NLRB, 147 F.2d 69, 74, 158 A.L.R. 1165 (5th Cir. 1945); General Committee of Adjustment of Brotherhood of Locomotive Engineers for Pacific Lines of Southern Pac. Co. v. Southern Pac. Co., 132 F.2d 194, 198 (9th Cir. 1942), rev'd on other grounds, 320 U.S. 338, 64 S.Ct. 142, 88 L.Ed. 85 (1943).

At the time the *Burley* decisions were written the duty of fair representation had only recently been developed in Steele v. Louisville & N. R. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), and was originally restricted to the prevention of racial discrimination. See Tunstall v. Brotherhood of Locomotive Firemen, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944). It has since been recognized that the duty of the collective representative to represent fairly all those for whom it acts is broadly applicable to all facets of the employee's relationship with his collective agent including particularly the settlement of grievances. Vaca v. Sipes, 386 U.S. 171, 190–193, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); Humphrey v. Moore, 375 U.S. 335, 349, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); Conley v. Gibson, *supra* at 46–47, 78 S.Ct. 99 (1957); Ford Motor Co. v. Huffman, 345 U.S. 330, 337–338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953); Gainey v. Brotherhood of Railway & Steamship Clerks, 313 F.2d 318, 324 (3d Cir. 1963); Ferro v. Railway Express Agency, Inc., 296 F.2d 847, 850 (2d Cir. 1961); Cunningham v. Erie R. R. Co., 266 F.2d 411, 415 (2d Cir. 1959). This duty is enforceable in the federal courts, see Glover v. St. Louis-S. F. Ry. Co., 393 U.S. 324, 329, 89 S.Ct. 548, 21 L.Ed.2d 519 (1969); Steele v. Louisville & N. R. R. Co., *supra* at 204–207, 65 S.Ct. 226, 89 L.Ed. 173 and provides a more effective means of protecting the employee against arbitrary abuses of settlement procedures than those envisaged in the *Burley* case. See Vaca v. Sipes, *supra* at 193, 87 S.Ct. 903. It is more realistic to require the collective agent to represent an employee's individual interests in good faith than to assume that the employee, if left in control of his griev-

ance, can act in his own behalf to safeguard his rights.

C. In Conley v. Gibson, *supra* 355 U.S. at 46, 78 S.Ct. at 102, a case involving the Railway Labor Act, the Court said:

> "Collective bargaining is a continuing process. Among other things, it involves day-to-day adjustments in the contract and other working rules, resolution of new problems not covered by existing agreements, and the protection of employee rights already secured by contract. The bargaining representative can no more unfairly discriminate in carrying out these functions than it can in negotiating a collective agreement." (Footnote omitted.)

Once the collective agreement is negotiated, the collective agent can continue to perform fully the duty to accommodate individual interests with collective concerns only if it is given the authority to settle grievances. In almost every instance an employee's claim, no matter how seemingly individualized, how apparently restricted to a dispute concerning the rights of a sole employee, will have ramifications which effect the rights of many other employees. For example, even the disposition of a claim for back pay, such as is involved in this case, as seemingly isolated claim, is bound to effect the subsequent disposition of similar claims. See Republic Steel Corp. v. Maddox, 379 U.S. 650, 656, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965); see generally, Cox, Rights Under a Labor Agreement, 69 Harv.L.Rev. 601 (1956).

The importance of grievance settlement in the function of continuously balancing individual concerns against the collective interest was recognized by the Supreme Court in Vaca v. Sipes, *supra*. There the Court held that an employee may seek judicial enforcement of his contract rights without prior resort to contract remedial procedures only where "the union has sole power under the contract to invoke the higher stages of the grievance procedure, *and* * * * the employee-plaintiff has been prevented from exhausting his contractual remedies by the union's *wrongful* refusal to process the grievance." 386 U.S. at 185, 87 S.Ct. at 914. Such wrongful refusal, the Court said, must amount to a breach of the union's "duty of fair representation in its handling of the employee's grievance" claim. *Id.* at 186, 87 S.Ct. at 914.

The major premise underlying the Court's decision in *Vaca* was its conclusion that while a union "may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion," the individual employee did not have the "absolute right to have his grievance taken to arbitration regardless of the provisions of the applicable collective bargaining agreement." 386 U.S. at 191, 87 S.Ct. at 917. The Court said:

> "In providing for a grievance and arbitration procedure which gives the union discretion to supervise the grievance machinery and to invoke arbitration, the employer and the union contemplate that each will endeavor in good faith to settle grievances short of arbitration. Through this settlement process, frivolous grievances are ended prior to the most costly and time-consuming step in the grievance procedures. Moreover, both sides are assured that similar complaints will be treated consistently, and major problem areas in the interpretation of the collective bargaining contract can be isolated and perhaps resolved. And finally, the settlement process furthers the interest of the union as statutory agent and as coauthor of the bargaining agreement in representing the employees in the enforcement of that agreement. See Cox, Rights Under a Labor Agreement, 69 Harv.L.Rev. 601 (1956).

> If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract

would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation." *Id.*

The Court added that there did not appear to be any "substantial danger to the interests of the individual employee if his statutory agent is given the contractual power honestly and in good faith to settle grievances short of arbitration." *Id.* at 192, 87 S.Ct. at 918.

■■ The evidence in this case conclusively establishes that the Brotherhood acted at all times honestly, in good faith and with diligence in negotiating a settlement of Pyzynski's grievance. When the first medical examination directed by the Special Board turned out unfavorably to Pyzynski, the Brotherhood petitioned for a re-examination. When the Railroad refused to go along with this procedure, the Brotherhood, rather than perfunctorily dropping the matter, actively engaged the Railroad in negotiations looking towards a settlement. Pyzynski was informed as to the progress of these negotiations, and the Brotherhood repeatedly attempted to make certain that Pyzynski consented to the Brotherhood's compromise proposals. Nor can the Brotherhood be faulted for its decision to pursue a settlement rather than to institute a court action to secure the Raillroad's compliance with the order of the Special Board directing a re-examination. A union does not breach its duty of fair representation when it makes a good faith decision that the merits of a particular claim do not warrant instituting legal proceedings, for a union must be allowed to exercise reasonable discretion as to how it can best satisfy the interests of the individual as well as the interests of the collective unit. See Vaca v. Sipes, *supra* 386 U.S. at 194, 87 S.Ct. 903; Humphrey v. Moore, *supra* 375 U.S. at 349–350, 84 S.Ct. 363; Ford Motor Co. v. Huffman, *supra* at 337–339, 73 S.Ct. 681;

Ferro v. Railway Express Agency, Inc., *supra* 345 U.S. at 851; Cunningham v. Erie R. Co., *supra* 266 F.2d at 417. In short, there is no evidence that the Brotherhood acted at any time in bad faith or with hostile discrimination against Pyzynski with regard to his grievance claim.

■ Nor can we find that the Railroad engaged in conduct which would deprive it of its right to rely on the Brotherhood's representation that it was authorized to settle Pyzynski's grievance. There was, at the very least, a substantial question as to the validity of the Special Board's second award. The Board's first award directed that Pyzynski be subjected to a medical examination to determine his fitness to return to work. When this examination proved unfavorable to Pyzynski, the Brotherhood, alleging certain improprieties affecting the impartiality of the first examination, petitioned the Board for a re-examination. The second award issued by the Board, directing that such a re-examination be conducted, was characterized as an "interpretation" authorized by the agreement establishing the Special Board and by 45 U.S.C. § 153 First (m). It would appear more correct, however, to characterize this second award not as a mere clarification of the first, but rather as an entirely different award embodying a significant change in the disposition of the claim. It is familiar law that an informal tribunal such as a system board, having issued a final award, is *functus officio* and has no power to issue a further award which is in no sense an interpretation of the first award but designed completely to displace it. Therefore the Railroad's refusal to adhere voluntarily to the second award did not rise to the level of a repudiation of the contract grievance procedures justifying Pyzynski's independent suit here on the contract claim.

■ The carrier was under a statutory obligation to negotiate with the

union in an effort to settle employee grievances.

■ The grievance procedures can function as contemplated by the Act only if the carrier is able to rely on the authority of the union to negotiate a conclusive settlement—a settlement which is binding on the employee unless the union has breached its duty of fair representation or unless the employer itself has engaged in fraudulent conduct. Vaca v. Sipes, *supra* 386 U.S. at 185, 87 S.Ct. 903; Glover v. St. Louis-S. F. Ry. Co., *supra* 393 U.S. at 330, 89 S.Ct. 548; Carroll v. Brotherhood of Railroad Trainmen, 417 F.2d 1025 (1st Cir., October 29, 1969); O'Mara v. Erie Lackawanna R. R. Co., 407 F.2d 674 (2d Cir. 1969), cert. granted sub nom. Czosek v. O'Mara, 396 U.S. 814, 24 L.Ed.2d 66 (October 14, 1969).

■ Applying these principles to the facts of this case, we hold that it was error to send the issue of the union's authority to settle Pyzynski's grievance to the jury, for we conclude that the evidence does not establish either that the Brotherhood breached its duty of fair representation or that the Railroad engaged in any conduct which would deprive it of its right to rely on the Brotherhood's apparent authority to settle Pyzynski's grievance. As a matter of law one of these wrongful actions must be found to have occurred before an employee can sue his employer on a contract claim which has already been negotiated to a settlement between the employer and the employee's collective representative, purporting to act on his behalf.

For these reasons, we reverse the judgment of the court below and remand with directions that the judgment in appellee's favor be vacated and that judgment be entered in favor of the appellant Railroad.