**L. F. COLE, Plaintiff,**

v.

**ERIE LACKAWANNA RAILWAY** and
Public Law Board No. 855,
Defendants.

No. C 73–70.

United States District Court,
N. D. Ohio, W. D.

May 5, 1975.

**66**

Eugene A. Yazel, Marion, Ohio, for plaintiff.

Patrick I. Foley, Asst. U. S. Atty., Malcolm P. Crowther, Jr., Toledo, Ohio, for defendants.

*OPINION and ORDER*

WALINSKI, District Judge.

This cause is before the Court on plaintiff's motion for summary judgment and defendants' corresponding motion to vacate this Court's earlier Order of February 6, 1974. Both sides have extensively briefed these matters.

Before resolving this dispute, it is useful to set out briefly the past developments in this case. This cause was originally filed February 9, 1973, as a petition under § 3 First (q) of the Railway Labor Act to set aside an award of a special adjustment board which had upheld plaintiff's dismissal from employment with the defendant. On February 6, 1974, this Court, upon cross motions for summary judgment, ordered this cause remanded to the special adjustment board [hereinafter the Board] for reconsideration upon due notice to the plaintiff and that he be afforded the opportunity to be heard through counsel and present evidence on his behalf. The decision was based on the Court's conclusion that plaintiff had not been given due notice of the Board's hearing and had been denied the opportunity to be heard through counsel and to present evidence.

The Board was subsequently reconvened and after due notice held a hearing on August 19 and 20, 1974, at which plaintiff was heard through counsel and presented evidence. Thereafter, on October 28, 1974, the Board entered an award in favor of plaintiff which he was restored to duty with full seniority rights, vacation, and all privileges. His discharge from employment was converted to a disciplinary lay-off of 365 days, and he was awarded back pay for the time from the end of the disciplinary lay-off to the date of restoration to duty. By his motion for summary judgment, plaintiff seeks to have this award enforced, pursuant to § 3 Second of the Act.

Defendant not only opposes enforcement of this award, but also asks the Court now, nearly fifteen (15) months afterward, to go back and set aside the February 6, 1974 Order of the Court on the grounds that a statement was "erroneous" and that plaintiff in fact had actual knowledge of the first hearing by the Board at which plaintiff's discharge was considered. Plaintiff argues in rebuttal that defendant's motion is untimely according to the provisions of Rules 59 and 60, Federal Rules of Civil Procedure, and that if defendant objected to the February 6th Order, he should have complied timely with these rules or have taken an appeal since the February 6th Order was clearly a final, appealable Order.

There is no doubt in the Court's mind that defendant is correct in arguing that a separate document had to be filed in compliance with Rule 58 in order for the time limitations of Rules 59 and 60 to be applicable. *United States v. Indrelunas*, 411 U.S. 216, 93 S.Ct. 1562, 36 L.Ed.2d 202 (1973); *Columbus Coated Fabrics v. Industrial Comm. of Ohio*, 498 F.2d 408 (6th Cir. 1974).

However, the Court is troubled by letting defendant now reopen the issues underlying the February 6th Order, especially after the matter has been remanded to the Board, new hearings held, and an award entered. Obviously, the prejudice and expense to plaintiff are great in so doing. Plaintiff, quite prop-

erly, had reason to believe that these matters were decided and at rest, in the face of defendant's failure to appeal, or move for reconsideration, *before* the Board's rehearing. It could be fairly said that defendant is guilty of the very kind of wait-and-see-which-way-the-wind-blows tactics which it accuses plaintiff of pursuing before this lawsuit was filed.

Any prejudice to defendant in refusing now to reopen the February 6th Order is avoided, however, if defendant's contentions regarding due notice and actual knowledge are without merit. These new contentions stem from certain responses given by plaintiff during an oral deposition on February 13, 1975. From these it is now argued that plaintiff had actual knowledge of the Board's first consideration of the matter, sufficient to constitute due notice, and that he stood by and "allow[ed] matters to be thrashed out to a conclusion." Only then, disappointed with the result, did he file the present suit claiming he was deprived of notice and an opportunity to be heard.

■ The Court has carefully reviewed the transcript of this deposition and has concluded that, even if defendant is given the benefit of all favorable inferences, nothing therein sustains its argument. (The relevant portions are attached hereto as an appendix.) It should be remembered in this context that the kind of notice or knowledge, required by § 3 First (j) is, in the words of one court:

"[a]ctual notice of the hearings for a sufficient period prior thereto to permit [plaintiff] to be present and to be heard * * *." *Hunter v. Atchison, T. & S. F. Ry. Co.,* 188 F.2d 294 (7th Cir. 1951).

■ Even assuming that plaintiff's answers could be held to be an admission that he had actual knowledge that "proceedings [were] pending before the [Board] to dispose of" his claim, an assumption the Court has no hesitation in rejecting, there are compelling doubts that he had any such knowledge in sufficient time to permit him to retain counsel, gather his witnesses and be present at the Board's hearing so as to be heard. Moreover, it is clear, notwithstanding whether the Union breached any duty of fair representation in telling plaintiff that he could not be present at the Board's hearing, that all doubts would have been removed if the Board itself had simply served formal notice on the plaintiff of the pendency of its proceedings. There can be no doubt that this is a clear duty imposed on the Board by § 3 First (j) of the Act.

■ Defendant also argues, in this regard, that plaintiff had authorized the Union to handle his grievance and to represent him before the Board and that plaintiff did not act, as his Union Constitution required him to do, so as to revoke the authority and assume his own representation.

It is true as defendant argues that:

"A carrier may rely on the authority of a union to negotiate a conclusive settlement of an employee's grievance if it can be shown either that the union acted upon the basis of actual authority, whether individually given or to be gathered from the union constitution or by-laws or from custom and usage or that the employee had notice or knowledge of the actions taken by the union in his behalf and took no steps to negate the union's authority." *Pyzynski v. New York Cent. Rd. Co.,* 421 F.2d 854, 859–60 (2nd Cir. 1970), *interpreting Elgin, J. & E. R. Co. v. Burley,* 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945), *on rehearing* 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946).

Within the context of the facts of *Pyzynski,* this Court is in complete agreement with that proposition.

However, in the case at bar, there is no written authorization empowering the union to represent plaintiff at the Board hearing and relinquishing his right to be present with counsel, as

there was by analogy in *Pyzynski.* *Id.* fn. 9 at 860. Moreover, as has been shown, plaintiff could not be said to have had notice or knowledge of the actions taken by the union on his behalf. Here all he "knew" was a sort of a vague notion that the union would "get his job back."

Moreover, this Court feels that company reliance on the Union Constitution or by-laws or on custom and usage is more appropriate where the dispute involves a group of its employees over, e. g., which union's members are going to perform a specific job. In that kind of dispute, it is clear that the policies of peaceful settlement through collective bargaining which underlie our federal labor laws dictate that the railroad may reasonably rely on the apparent authority of the union to settle the matter or represent its members before a board of arbitration.

■ These policies give way however when the dispute is between a single employee and the company who employs him. In such a case the union's interest in settling such a dispute, and the character of representation it feels it can give, are often at odds with the individual's interest in preserving his means of livelihood. Thus, in recognizing these interests, Congress specifically gave the employee the right to appear on his own, and with his own counsel, in hearings which will decide the issue of greatest importance to him.

This Court obviously feels, unlike the *Pyzynski* court, that subsequent events since the *Burley* decisions have not diminished any urgency to give individual employees considerable leeway in pursuing their own grievances. *Pyzynski, supra* at 861–864. A union member faces considerable obstacles in attempting to establish a claim of breach of the duty of fair representation by his union. In order to make such a claim plaintiff would have to prove "arbitrary or bad faith conduct on the part of the union." *Vaca v. Sipes,* 386 U.S. 171, 193, 87 S. Ct. 903, 918, 17 L.Ed.2d 842 (1967). He would, moreover, find it necessary:

"to adduce substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives * * *." *Motor Coach Employees v. Lockridge,* 403 U.S. 274, 301, 91 S.Ct. 1909, 1925, 29 L.Ed.2d 473 (1971).

Since the union is entitled by federal labor policy to make good faith judgments as to when and how far it will press an individual employee's grievance, and the same federal policies dictate a need that the union may only be sued by that member for bad faith, intentionally severe, and irrational conduct, it is clear that there is a definite need for considerable leeway to permit the member to pursue his own grievance. Otherwise, the member is left with the impossible situation of permitting the union to press his claim behind closed doors and giving him no practical legal remedy when the union's representation has been deficient.

The fact that an employee may be required to join the union only points up more clearly the urgent need for permitting him to press his own claim and to secure his own future.

"Men at some time are masters of their fates:

The fault, dear Brutus, is not in our stars,

But in ourselves, that we are underlings."

Shakespeare, *Julius Caesar,* Act I, scene ii.

Finally, in arguing that plaintiff failed to act affirmatively so as to assume his own representation, defendant appears to overlook the extent to which plaintiff seems to have been deceived, albeit unintentionally, by the appearance of regularity.

Plaintiff claims, and defendant does not dispute, that he contacted union officials and specifically stated his interest in being present at the hearing. He further stated that he had witnesses

who would apparently testify about the events which led to his dismissal and that he wanted to have them present; but the union told him that that wouldn't be necessary and that he didn't need to bring his witnesses. Thus, it is apparent that plaintiff was denied any opportunity to conduct his own representation before the Board which, failing to notify him formally of the pendency of its proceedings and his right to be present, helped to foster this illusion of propriety.

In *Hollingsworth v. Balcom,* 441 F.2d 419 (6th Cir. 1971), the court considered a claim by a naval reservist who contended that he had been denied notice that a hearing crucial to his application for discharge as a conscientious objector, was to be held and that his failure to object to continuation of the hearing did not constitute a waiver of his right to have counsel present. The district court had found that when he was summoned for an interview with his commanding officer, he was not told that it was to be the crucial hearing. He was further told that it would not be necessary to bring his lawyer with him in spite of the commanding officer's knowing that the reservist had consulted counsel.

In agreeing with the reservist's contentions, the Sixth Circuit said:

"[a]ccepting as we must the finding of the District Court that appellant must have realized at some point that the [hearing] was being held, we think that the lack of prior notice and the 'appearance of regularity' [citing *Yellin v. United States,* 374 U.S. 109, 123 [83 S.Ct. 1828, 10 L.Ed.2d 778] (1963)] dissuaded him from objecting. We cannot agree that his failure to stop the [hearing] amounted to a waiver of his right." *Id.* at 424.

This Court feels that much the same considerations apply here. Without a formal notice from the Board, plaintiff was foreclosed from making the very decision which § 3 First (j) empowers him to make; thus, his failure to act affirm-

atively cannot be held to have been a waiver of his right. Accordingly, the Court has concluded that the February 6th Order shall stand that that defendant's motion is not well taken.

■ As to plaintiff's motion for summary judgment, it is equally clear that he is entitled to have the Board's award of October 28, 1974, enforced. Section 3 First (p) provides for such enforcement and all of the procedural requirements appear to have been followed. The Court sees no need for any further delay in plaintiff resuming the employment to which the Board felt he was entitled.

Accordingly, it is

Ordered that the Award of Public Law Board No. 855 of October 28, 1974, relative to the plaintiff herein, be enforced in accordance with its terms, and defendant Erie Lackawanna Railway Company is hereby ordered to comply with the provisions of this Award.

### APPENDIX

\* \* \* \* \* \*

Q. Do I understand that Murphey is the President or the Local Chairman or whatever the highest official is here?

A. Local Chairman here. I would even call Freshower in order to get in touch with them and sometimes I would run into Freshower in a store around town and we would talk about it and discuss it.

I would run into him maybe five or six times in different department stores and we would discuss it and I would ask him every time I would see him and he would say, I can't tell you, then the last time I saw him he told me and I talked to Murphey.

Q. And you knew what he was doing?

A. Right, and I thought I knew what he was trying to do for me.

Q. Well, they were not trying to do something that you didn't tell them not to do?

A. Oh, no.

Q. So they had your authorization to go forward?

A. I assume. I didn't tell them to go ahead or not to go ahead. I assumed that they understood that I was a member of the union and they knew what they should do for me and what they were to do without me telling them to go ahead or anything like that.

Q. Well, you expected them to carry forward with your grievance; isn't that right?

A. Right.

Q. And this wasn't any shock to you that they were going forward?

A. No; I expected them to.

Q. Yes. And you didn't do anything on your own to tell them not to go ahead; did you?

A. Oh, no, I didn't do nothing like that.

Q. And you didn't do anything on your own to process it yourself, I gather?

A. No; I didn't. I asked them if there was anything I could do for them and they said, no, they said there isn't anything we could do.

I asked them if I could bring any witnesses or just come in there myself and they said there was no use.

Q. Now, we are talking about a Board procedure hearing as contrasted to meeting with the management people?

A. I don't quite understand that.

Q. You say they told you that you couldn't do anything and I'm asking you was that with respect to a Board procedure when they were going to go before it or did that have to do when they were dealing directly with the Superintendent or whoever it was of management at a lower level?

A. I asked them at the lower level. First we had the investigation; that came first and then I asked them when we went before the Labors Relations Board on the final one up there for the decision and they made the statement that they had four cases and mine was the best one of the four and that I didn't have to bring any witnesses in and I couldn't go in myself because it was a closed door session is what they told me, what Murphey told me.

Q. But you knew there was going to be a hearing?

A. Oh, yes; I knew there was going to be a hearing.

Q. And they told you though that there wasn't any sense in going?

A. Right.

MR. PIACENTINO: Just for clarification, you said there was going to be a hearing and is he talking about the Board hearing or what hearing; I don't think it's clear; did he know the date of the hearing or what is he talking about?

BY MR. BRUGGEMAN:

Q. Well, specifically, you knew there was going to be a Board hearing; is that right?

A. Oh, yes, because I was up to Murphey's office before the Board hearing, a few days before the Board hearing and I was told there was going to be the Board hearing.

Q. And that was to be held in Cleveland?

A. Yes; with three members.

Q. So you knew that two or three days before?

A. Yes.

Q. From what Murphey had told you?

A. Yes.

Q. That there was going to be a Board hearing?

A. Yes—I would say it was probably a week before.

Q. And you inquired whether you could be there and he said you can be there but you would have to sit out in the hall?

A. That's right.

Q. And he said you had the best case?

A. That's right.

Q. And he told you that you didn't need to bring any witnesses; is that right?

A. That's right.

Q. Are you familiar with the Constitution of the UTU insofar as representation is concerned?

A. Well, I was a little more familiar with it then than I am now because I have forgotten a lot of the stuff but at one time I knew more than I do now about it.

Q. Were you familiar with the fact that the union did have a constitution?

A. Oh, yes.

Q. Were you also familiar with the fact that grievances are to be handled by the railroad union unless you say to the contrary?

A. Yes.

Q. And you knew that?

A. Right.

Q. So you could have stopped them by saying, "Don't do it anymore."

A. I could have stopped them; right.

Q. And you knew you could—

A. But I thought that's what I was paying my union dues for, to have representation.

Q. That's what you say you thought?

A. Yes.

Q. That they were representing you?

A. Yes.

Q. And they told you what was going on and they told you that they couldn't do anything about it after the decision came?

A. That's right.

Q. Mr. Cole, I have a copy of the Constitution of the United Transportation Union known as the Unification Agreement and Constitution.

Are you familiar with this booklet?

MR. PIACENTINO: Was that the one that was in effect at that time, at the time of the dispute?

MR. BRUGGEMAN: Yes; I am told that it was; let me go over these dates here.

(Discussion off the record.)

BY MR. BRUGGEMAN:

\*   \*   \*   \*   \*   \*

question.

Q. After the discharge of April 7, 1971, did you tell the union to go ahead and process your grievance?

MR. PIACENTINO: Objection relating to relevancy. Go ahead and answer the question if you can. I would say—I don't want to restate my entire objection previously made but it would apply to the same matters as previously stated under Subsection 153P [153, subd. 1(p)], limiting this matter to a very narrow scope of inquiry. As I say, I don't want to repeat the entire objection but I am referring to all three of my previous objections made.

MR. BRUGGEMAN: That is so understood.

A. As to that question, I never came out and told Freshower or Murphey or anyone, to go ahead and pursue it, but they told me what they were going to do. They said they were going to put the matter before the Labors Relations Board. Now, it would have to be through those various channels and I said, well, just so that I know what's going on.

Q. So, in other words, you permitted them to move forward with your grievance; is that right?

A. Right.

Q. And all you wanted to do was to be kept advised; is that right?

A. Yes.

Q. Is that a fair statement now?

A. Well, I didn't actually tell them not to do it or what to do because actually they were running it and I thought it was their duty because I was a member of the organization and of course they are supposed to represent me and they are supposed to represent each individual who pays their dues, so I just assumed that when you pay for something you automatically should be entitled to anything that they have to sell you or offer you.

Q. Well, you paid your union dues?

A. Yes.

Q. Up to the time that you were discharged?

A. Yes.

Q. And your discharge was covered by the union agreement?

A. Yes.

Q. And since you had paid your dues and you had the union agreement, you felt that they should proceed with your grievance; is that right?

A. Yes.

Q. All right, you knew that in this case the constitution gives them the authority to do it, gives them the authority to follow through on your grievance?

A. Right.

Q. Did they say anything to you at all about going to take the matter to the superintendent of the railroad here whose name was Packer, P-a-c-k-e-r, or who used to be?

A. I'm not sure but I believe Freshower told me that he had talked to Packer about the situation.

Q. And Packer said no?

A. I believe so.

Q. Then the next step would have to be to the Labor Relations people in Cleveland; is that right?

A. Yes.

Q. And did they tell you that they also said, no, that they had to go to the Board with it?

A. Right; yes, they did.

Q. And then they told you the Board hearing was going to be within five days or a week from the time they told you?

A. Yes.

Q. And you knew that?

A. Yes.

Q. And so you knew what was going on?

A. Part of the time, but I had to call them in order to find out or get in touch with them. I mean they never volunteered any information, I had to call Freshower the day or the evening after the hearing in Cleveland and I had to call him that evening at his office and he had gone in and so I believe I called him the next day and then he informed me what the outcome was on the hearing.

Q. This was the Board hearing with the three people?

A. Right. He then informed me of that decision that was handed down, I believe.

Q. That's when you went to your attorneys here?

A. No; just going back a minute—I believe I called them the day they was going up there for the trial and then I called him the next day and asked him about the decision or when they was going to come to a decision or when they would know for sure and he said that as soon as we know or as soon as we get the decision we will let you know and even at that point I waited a week or so or whatever time it was before I think—maybe thirty days or so before the decision was handed down.

I had to call again to find out and then he told me that they had lost the case.

Q. Was that when you went to your attorneys here?

A. Well, Freshower informed me they lost and that I should get in touch with Murphey and he should be the one who would inform me of this or something like that, so I went up to the Union Hall and Murphy told me that they had lost the case and he couldn't understand this and I couldn't either as far as that goes but anyhow, he informed me that they had lost and there was—the way you said it was something like, I can't tell you what to do and he said this was as far as we can go and we just can't proceed with it any further and he said it's out of our hands and he also said there just wasn't anymore we can do, so I said, well, it isn't fair and I told him, I said, I'll have to get me an attorney on

my own and then proceed with it, because I didn't feel that I had been handed a just decision on the matter.

So they informed me that I could go to Columbus and hire an attorney and they told me where to go.

So I went to Columbus and proceeded to hire an attorney and they didn't seem to want to do anything with the case so I come back to Marion and hired Mr. Piacentino.

Q. Was the attorney in Columbus the union attorney; was that a railroad union attorney?

A. Yes.

Q. Who handled their regular union work down there?

A. Some of it, yes. I guess from what I gathered they handled some railroad claims.

Q. But in essence the lawyer there said they weren't going to handle it or—

A. No; he didn't say he wouldn't handle it, he did take the case and he said they would be glad to take it but then they just sat on it for maybe six months or so and didn't turn anything over for me and I kept calling him and going down there to

\* \* \* \* \* \*

the one that you would go or would you bypass him for somebody else or what?

A. No; he was the next one up and he was the one that would handle any of our grievances so far as that goes.

Q. And was he the one right underneath Murphey?

A. Yes.

Q. Anybody else between them?

A. No.

Q. No one else between Freshower and Murphey?

A. No.

Q. After you were discharged, did your union make any independent inquiries of you, I mean come on forward Mr. Cole and we need this information and can you furnish further information or witnesses?

A. No; they never asked me for no information. All they wanted—they just had the investigation but they never asked me for any information and they never asked me if I could get witnesses or anything. I did volunteer this information.

Q. And this was for the Board hearing; is that right?

A. Yes; for the Board and for the investigation that was held on the lower level at the Trainmaster's office in Marion.

Q. You offered information?

A. Yes.

Q. Was that the initial hearing before you were discharged?

A. Yes.

Q. Now, did you offer to give any additional information to the union when it was heard by the Superintendent?

A. No; because I didn't know that there was going to be this meeting—I knew there was going to be a meeting some time and I assumed they would have one but I didn't know just when it was and it seems to me—I guess it was Freshower talked to me and said he talked to Packer some time and he wouldn't go along with putting me back to work.

Q. But then you did know there was going to be a Labor Relations hearing?

A. Yes.

Q. With the people in Cleveland?

A. Yes.

Q. And you were subsequently told that it didn't work either; is that right—you're shaking your head?

A. Well, I know it went before the Board, the Labor Relations people in Cleveland.

Q. So you did know it had gone to those people?

A. Right; I knew it went there.

Q. And those people also said no?

A. That's right.

Q. Then you knew it was going to the Board?

A. Yes, sir.

Q. When it was at the Superintendent's level or the Labor Relations level, did you offer to produce any witnesses or information?

MR. YAZEL: Just a minute. I'm going to object to that question because I don't think it has been clearly stated when that Superintendent's hearing was or how many hearings, as a matter of fact there were. We're assuming that there even was one and I don't think it has been established whether there was one or not.

A. Seems to me that in the back of my mind there was a hearing—I'm pretty sure there was one.

Q. Well, if you don't know say you don't know. It's perfectly all right.

MR. YAZEL: Let me make this objection. As I understand your question, you are stating that there were four hearings.

MR. BRUGGEMAN: Yes.

MR. PIACENTINO: The one would be called an investigation; is that correct?

MR. BRUGGEMAN: Yes.

MR. PIACENTINO: The second one would be called, according to our questioning and would be the second one, this was a hearing before the Superintendent?

MR. BRUGGEMAN: Yes.

MR. PIACENTINO: And then there was a hearing before the Labor Relations people in Cleveland?

MR. BRUGGEMAN: Yes.

MR. PIACENTINO: So that would be the third one.

MR. BRUGGEMAN: Right.

MR. PIACENTINO: Then one before the Board.

MR. BRUGGEMAN: Yes.

MR. PIACENTINO: So there were four separate levels of hearings on this case?

MR. BRUGGEMAN: That's correct.

MR. PIACENTINO: So there was an investigation and then a hearing before the Superintendent and something that was submitted to the Labor Relations in Cleveland and then the Board?

MR. BRUGGEMAN: That's the four levels.

A. Now that I have seen this I would say that I don't know for sure and I can't state that the union took it to the Superintendent.

Q. Well, in any event were you aware that it did go the Labor Relations people in Cleveland?

A. Yes; that's when they said no.

Q. Then it went to the Special Board?

A. Yes; I'm aware of those two procedures.

Q. You were aware of those as they were going along?

A. I was aware as they were going along, yes, sir. Not on the exact date but I would say right about that time.

Q. And you knew that the hearings were going to be held?

A. Yes.

Q. And you said you called and asked them what was happening?

A. All the time.

MR. BRUGGEMAN: I would like to offer into evidence Railroad Exhibits 1 and 2.

MR. PIACENTINO: We're going to object to their admission for the same reasons as we stated previously.

MR. BRUGGEMAN: So understood.

MR. PIACENTINO: As well as objecting to all the testimony given in this deposition not relating specifically to the issues before the court.

MR. BRUGGEMAN: I think I am finished. Do you want to inquire?