Clarence E. **HOLT**, Plaintiff,

v.

**SOUTHERN RAILWAY COMPANY**, Defendant.

Civ. A. No. 2340.

United States District Court, E. D. Tennessee, Northeastern Division.

Aug. 26, 1970.

See also, D.C., 51 F.R.D. 296.

John S. McLellan, Jr., D. Bruce Shine, and Thomas D. Dossett, Kingsport, Tenn., for plaintiff.

C. T. Herndon, III, Johnson City, Tenn., James I. Hardy, Washington, D. C., for defendant.

## MEMORANDUM OPINION

NEESE, District Judge.

This is an action for money damages for breach by the defendant railway of its contract of employment with the plaintiff Mr. Clarence E. Holt, its former employee. This Court has jurisdiction under 28 U.S.C. § 1332(a) (1), (c).

The controversy was stimulated by a derailment of the defendant's extra train no. 3003 west, as a result of the failure of the cargo of one of the gondola cars thereof to clear the overhead and side bracings in a natural tunnel in Virginia on the late evening of February 20, 1966. This was Pennsylvania car no. 614700, 52nd unit from the front of the train. It was transporting a "high, wide load" of structural steel and weighed 48,100 pounds.[1] The weight and dimensions of this car were such that, when it struck the overhangings in, and sides of, the tunnel, it careened and caused itself and the subsequent nine cars of the train to leave the tracks after emerging from the tunnel.

This car was received by the defendant railway from the Pennsylvania railroad at Louisville, Kentucky. The ulti-

---

1. Arbitrarily "guessed" at 60,000 pounds by the yard clerk Mr. Swayne, *infra*.

mate destination was Appalachia, (Andover yard) Virginia. An assistant vice president of the railway sent a mailgram[2] to all affected points, specifying that it was to move over Southern's lines, for transfer to the Clinchfield railroad at Frisco, Tennessee, via Danville, Kentucky, and Harriman, Coster, Beverly, Sevier and Bulls Gap, Tennessee. Under the railway's procedures, a special message would have accompanied the waybill on this car, containing substantially the same information as contained in the mailgram. Routing of this car from Bulls Gap to Appalachia over the main line of the railway caused it to pass through the tunnel where the aforementioned wreck occurred; its routing via Frisco would have avoided that tunnel.

The plaintiff Mr. Holt was the only yard clerk of the railway on duty at Bulls Gap when train no. 191 (which became the railway's extra train no. 3003 west, because it left Bulls Gap very late) was assembled. On the day after the accident, Mr. H. H. Hall, the railway's superintendent at Knoxville, Tennessee, located Mr. Holt in a barber shop in Greeneville, Tennessee and discharged him orally from his employment for his alleged failure to perform properly his duties. Mr. Holt was then a member of the Brotherhood of Railway, Airline and Steamship Clerks, a union which had entered into a collective bargaining agreement with the railway on August 21, 1954. Pursuant to the pertinent provisions of this agreement, Mr. Holt requested an investigation of his dismissal by Mr. Hall. Such investigation was conducted in Mr. Hall's office in Knoxville, Tennessee on February 28, 1966. Several employees of the railway were present.[3] Mr. Hall was accompanied to the hearing by Mr. Von Saylor, local chairman of Mr. Holt's union.

During this investigation, Mr. Holt was shown the outbound list for train no. 119 and the waybill and special message respecting the aforenumbered car. Such outbound list reflected that the aforenumbered car was to proceed to Appalachia through the aforementioned tunnel, while such waybill reflected that it was to proceed to Appalachia undeviatingly via Frisco, Tennessee, a routing which would have avoided the tunnel. Such special message[4] directed attention to the "high, wide load" on the aforenumbered car and directed that it be routed via Frisco. Thus confronted, Mr. Holt stated he "* * * guessed * * *" he prepared this switching list and evidently had received the waybill.

Mr. Saylor then appealed to the railway's new superintendent Mr. E. B. Burwell on March 15, 1966, and this appeal was denied on April 6, 1966. The decision of Mr. Burwell was appealed to Mr. P. S. Shu, the railway's general manager at Knoxville, by Mr. E. M. Broom, general (national) chairman of Mr. Holt's union, and it was denied on July 11, 1967. Mr. Broom then filed an appeal with Mr. John W. Staley, the railway's assistant director of labor relations at Washington, D. C., who denied relief on October 6, 1966. Messrs. Broom and Staley conferred again on April 3, 1967, when Mr. Broom requested that the appeal be remanded to Mr. Shu for further consideration.

The aforementioned bargaining agreement limited Mr. Holt to a period of nine months in pursuing his intra-railway appeals from his dismissal. After

2. The waybill itself was issued in Atlanta, Georgia on the basis that this car had no waybill and reflected a routing on Southern Railway via Spartanburg, South Carolina, Asheville, North Carolina, and Leadville and Bulls Gap, Tennessee and on the Clinchfield Railroad via Frisco, Tennesee and the Miller Yard to Interstate Railroad " * * * route to be observed no diviation [sic] * * * ".

3. The railway's trainmaster Mr. J. J. Seay testified at the investigation hearing that the mailgram or restriction form was attached to the waybill at the Bulls Gap yard.

4. This special message reflected an entirely different routing than that reflected by the waybill.

the lapse of nine months following the decision of Mr. Staley on October 6, 1966, Mr. Holt's grievance would have been barred, unless he had instituted proceedings before the appropriate division of the National Railroad Adjustment Board or a system, group or regional board, agreed upon by the union and railway; but, this period of limitation could be extended by agreement. At the meeting of April 3, 1967, such period was extended to one year from October 6, 1966.

Although Mr. Holt was aware that Mr. Saylor had referred his grievance to Mr. Broom and acquiesced in Mr. Broom's handling thereof, Mr. Holt was unaware that another representative of his union, Mr. J. D. Bushart, Jr., was participating. Without Mr. Holt's authority, Mr. Bushart and Mr. Shu settled the dispute on June 20, 1967, so that Mr. Holt would be reinstated in his former position with no impairment of his seniority by virtue of his absence from work on a leniency basis, with Mr. Holt withdrawing any claims for wages lost because of his dismissal. Thereupon, Mr. Broom withdrew Mr. Holt's claim for back-pay, and Mr. Holt was reinstated in his former position, effective June 23, 1967.

Mr. Holt was laboring under the impression at that time that he would lose his seniority, even if reinstated in his former position. During the period of his dismissal, although he was working irregularly at odd jobs for $5–$10 per day, he was not required to drive several miles between his home and former place of employment. Mr. Holt submitted his resignation to the railway on July 18, 1967, and it was accepted.[5] He learned for the first time, when his deposition was taken on April 21, 1970 for purposes of discovery herein, that he would have retained his seniority status with the railway, if he had returned permanently to his former employment.

Mr. Holt was a station laborer for the railway at Greeneville, Tennessee for 10 years. He was promoted to a position of yard clerk at Bulls Gap, where he was earning $320 a month. At the time of trial he was 43 years of age and had a work expectancy of seven additional years. After he obtained no relief under the collective bargaining procedure mentioned, he made a personal appeal to a vice president of the railway whom he knew. He invited attention to the fact that he had accumulated 21 years and ten months of service with the railway and had experienced no previous difficulty. This was apparently the catalyst for the leniency reinstatement.

The evidence showed that, as trains came through the railway's yard at Bulls Gap, whatever cars are to be handled therein are separated from the remainder of the train and left there. The yard clerks at Bulls Gap have no duties [6] to perform concerning cars which are not left there. As to the cars which are left there, however, it is the duty of the yard clerks to prepare a "switch list" for the use of the yard switching crew in the movement of such cars within the yard. This list includes the (owning or operating line's) initials, the numbers of the cars, the kinds, whether each car is empty or contains cargo, the destination of each car, and "other" information.

The practice at the Bulls Gap yard in preparing these lists is varied. Mr. Holt prepared this incoming switching list from switch lists dropped off inbound trains. Another yard clerk, Mr. James Swayne, prepared such lists from the respective waybills received from the conductors of the incoming trains. The switching in the yard was done in such manner that all cars outbound for a particular destination from Bulls Gap were

5. Mr. Holt received a civil service appointment as a member of the fire department of the Town of Greeneville, Tennessee, in August, 1967.

6. Mr. Holt received no instructions or directions from anyone authorized by the railway concerning the method of his performing his duties as yard clerk at the Bulls Gap yard.

switched onto a particular track or tracks, designated by the yard clerks. Thus, all the cars on that track (or those tracks) constituted a "block" to be hauled by a particular outbound train. By some manner (apparently personal to the particular yard clerk performing the task at the time), the yard clerks then prepared another switch list of the respective blocks for delivery to the conductor of the outbound train of which such block would constitute a part. On the outbound journey, these lists advised the conductor where to leave each such car. Both Messrs. Holt and Swayne stated it was their practice to check visually each car on each block, and a separate list was prepared for each block.

The aforenumbered car appears to have been lost somewhere between Louisville, Kentucky and Bulls Gap, Tennessee. It appears to have reached Knoxville, Tennessee and to have arrived at Bulls Gap via the railway's extra train no. 3064 at about ten o'clock, p. m., on Saturday, February 19, 1966. At this time, Mr. Holt was on duty as a yard clerk and prepared the switching list. This list reflects that the aforenumbered car was loaded, but its destination is not shown thereon.

Mr. Holt next reported for duty as of two o'clock in the afternoon on the day of the wreck. Mr. Swayne was scheduled to go off-duty at that time, although on occasions the departing yard clerk remained in the yard after his scheduled time for departure. Before Mr. Holt entered upon his duties, Mr. Swayne had entered 26 empty coal cars on the outbound list for train no. 119. Mr. Holt took the seat Mr. Swayne had been occupying in the yard office. Then, according to Mr. Swayne:

*    *    *    *    *    *

*  *  * I told him I had the cars checked, what was already in line and wrote-up [sic]; and, I looked out the window, and that car [Pennsylvania car no. 614700] was setting [sic] over in the front of the yard office: and I wrote that number down on the switch list from where I was at the yard of-fice—of the car; and I turned around and had this list already prepared and wrote it on this list. This is how I did it. * * *

Mr. Swayne admitted that he knew he had placed the aforenumbered car on the list of cars destined for movement directly to Appalachia, and not on the list of cars destined for transfer to the Clinchfield line at Frisco; that the list of cars destined for Frisco had not then been started; and that, " * * * I don't [sic] guess I should have put it on that list * * *. I have written-up cars on the wrong list. * * *" Neither Mr. Holt nor Mr. Swayne remembers referring to the waybill for the aforenumbered car or any special message attached thereto (if, in fact, it was thus attached). Neither recalls having seen the mailgram supposedly preceding the arrival of the aforenumbered car. Mr. Holt testified that it was the practice at this yard for yard clerks to fold-up waybills when a track had been checked visually and place them in a filing slot in the yard office, in which documents respecting a particular block are located, and that relieving yard clerks " * * * never go back through it. * * *"

Mr. Anderson, the conductor of the train which wrecked, testified that there was no special message attached to such waybill when the pertinent waybills were checked after the accident. Strangely, Mr. Anderson testified also that the waybill for the aforenumbered car included its dimensions, whereas none appear on the waybill exhibited herein. Had Mr. Swayne checked the waybill after listing the aforenumbered car as one standing on the track containing the cars destined for Appalachia (Andover), he would have received notice that this car was to be routed to Appalachia undeviatingly via Frisco, Tennessee, and it would not have been on the main line which passes through natural tunnel.

The Court can only find and conclude from this confused set of facts that the officials of the defendant railway presented to Mr. Holt at the investiga-

tion documents which he had not seen before, but which gave the appearance of documents he should have seen before in the normal course of events. It appears to the Court that the handwriting of Mr. Swayne on the list in question is firmer than that of Mr. Holt, but the similarities of these handwritings are sufficient to be confusing to an untrained eye.

Under the aforementioned bargaining agreement, Mr. Holt could have been discharged from his employment only for just cause. The railway is now estopped judicially to defend on the ground that the wreck involved was caused proximately by the failure of Mr. Holt to perform properly his duties. Holt v. Southern Railway Company, D. C.Tenn. (1969), 51 F.R.D. 296. Indeed, this Court finds and concludes as dictum that any such fault in the railway's yard at Bulls Gap was as much, or more, the act of Mr. Swayne as or than that of Mr. Holt; although, such a finding is redundant.

■ ■ Mr. Holt accepted his discharge as final and brought this action. He was not required to pursue his remedies established by the collective bargaining agreement of his union with the railway subject to the Railway Labor Act or his right to review before the National Railroad Adjustment Board. Walker v. Southern R. Co. (1966), 385 U.S. 196, 87 S.Ct. 365, 17 L.Ed.2d 294, 296, rehearing denied (1967), 385 U.S. 1020, 87 S.Ct. 699, 17 L.Ed.2d 559. The conduct of the railway, through its superintendent Mr. Hall (in summarily dismissing Mr. Holt without a more careful investigation of his fault), and through its officials (in presenting documents to Mr. Holt at the administrative investigation as having been before him at Bulls Gap at the time of the misrouting of the aforenumbered car, when such is found not to have been the case), misled Mr. Holt justifiably into a good-faith belief that his misdeed had caused the accident in question. The defendant railway is estopped to thus take advantage of its own wrong. Glus v. Brook-lyn Eastern District Terminal (1959). 359 U.S. 231, 232–234, 79 S.Ct. 760, 3 L.Ed.2d 770, 773 (esp. headnotes 1–8, inclusive).

■ Ordinarily, " * * * a carrier may rely on the authority of a union to negotiate a conclusive settlement of an employee's grievance if it can be shown either that the union acted upon the basis of actual authority, whether individually given or to be gathered from the union constitution or by-laws or from custom and usage or that the employee had notice or knowledge of the actions taken by the union in his behalf and took no steps to negate the union's authority. * * * " Pyzynski v. New York Central Railroad Company, C.A.2d (1970), 421 F.2d 854, 859–860 [4]. Here, however, not only was Mr. Holt misled by the railway concerning his misfeasance, when a more thorough investigation would have probably shown him not to have been guilty thereof, he resigned his employment rather than accept the settlement on a leniency basis negotiated for him by some official of his union; thus, he indicated " * * * disaffection from the Brotherhood's efforts. * * * " Ibid, 421 F.2d at 861 [6].

■ The final consideration is whether Mr. Holt is barred from recovery by the provision in his union's agreement with the railway that lawful action for the settlement of his claim or grievance could only be instituted within twelve months of the date of the final decision of Mr. Staley, as the highest designated officer of the carrier. Equitable considerations aside, Mr. Holt's union was unauthorized to contract away in advance of a controversy his personal right to maintain this action within the period permitted by the applicable Tennessee statute limiting actions on contracts. T.C.A. § 28–309. Such a clause, the effect of which is to oust the jurisdiction of courts, is contrary to public policy and will not be enforced. DaFoe v. Starek, C.A.Tenn. (1929), 9 Tenn.App. 668, 673 [2], certiorari denied (1929); Carr v. American Insurance Company, D.C.

**870**

Tenn. (1957), 152 F.Supp. 700, 701; *accord*: Carbon Black Export, Inc. v. The Monrose, C.A.5th (1958), 254 F.2d 297, 300–301 [3], certiorari dismissed (1959), 359 U.S. 180, 184, 79 S.Ct. 710, 3 L.Ed.2d 723, 726, rehearing denied (1959), 359 U.S. 999, 79 S.Ct. 1115, 3 L.Ed.2d 986.

■■ The Court finds that the defendant Southern Railway Company breached its contract of employment with the plaintiff Mr. Clarence E. Holt, by discharging him without just cause on February 20, 1966. The parties will stipulate within ten days herefrom the amount of Mr. Holt's actual damages, or show the Court within that time why same cannot be done. Because of the erroneous admission of fault by Mr. Holt at the aforementioned investigative hearing, the Court finds further that punitive damages should not be assessed herein against the defendant.

Judgment will enter to this effect after the filing of the aforeordered stipulation.