NATIONAL AIRLINES, INC.,
Plaintiff-Appellee,

v.

INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE
WORKERS et al., Defendants-
Appellees,

Walter R. Reed et al., Intervenors-
Appellants,

and

Donald V. Hall et al., Intervenors-
Appellants.

No. 72-2992.

United States Court of Appeals,
Fifth Circuit.

May 24, 1973.

Bruce E. Lazar, Miami, Fla., for Donald V. Hall and others.

Richard L. Horn, Allan Milledge, Miami, Fla., for Walter R. Reed and others.

William B. Killian, Miami, Fla., for National Airlines, Inc.

Joseph P. Manners, Miami, Fla., for I.A.M.A.W.

Don R. Livingstone, South Miami, Fla., for Taft & Tabo.

Plato E. Papps, Gen. Counsel, IAMAW, Washington, D. C., for defendants-appellees.

Before TUTTLE, THORNBERRY and DYER, Circuit Judges.

TUTTLE, Circuit Judge.

■ This third appeal [1] in a dispute arising from the mass discharge by National Airlines in January, 1969, of wildcat strikers while the "freeze" provisions of the Railway Labor Act, 45 U.S. C. § 156, were in effect is brought by two groups of intervenor employees dissatisfied with a settlement agreement between National and the International Association of Machinists and Aerospace Workers (I.A.M.). While granting the motions of both groups to intervene, the district court held that the I.A.M. had the right and authority to settle the claims of the Hall Group subject to an obligation of fair representation.[2] The court thereupon acted on the settlement, binding even those objecting members of the I.A.M. However, it held that the claims of the other group of intervenors (Reed, Blackett, and Moseley) were not within the issues before it under the mandate of our *National Airlines II* order. We affirm.

### I. The Hall Group

Donald V. Hall and twenty-seven other members of the I.A.M., having made substantial earnings during the out period [3] from overtime work with other employers, were dissatisfied with the portion of the settlement providing for full deduction of these earnings from the compensation to be paid them by National. The members of the Hall Group contend that they were punished for their diligence while less enterpris-

1. The previously-reported decisions relating to this discharge appear at 416 F.2d 998 (5 Cir., 1969) [National Airlines I] and 430 F.2d 957 (5 Cir., 1970) [National Airlines II].

2. While the collective bargaining representative has a duty to represent fairly all those for whom it acts, particularly where the settlement of grievances is concerned, Vaca v. Sipes, 386 U.S. 171, 190–193, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), Humphrey v. Moore, 375 U.S. 335, 349, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), and Conley v. Gibson, 355 U.S. 41, 46–47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), no evidence

appears to indicate that this duty was breached. There was ample evidence before the district court concerning the course of bargaining to support this finding:

"The parties regotiated for nearly a full year and clearly in good faith. The members of the I.A.M. were represented fairly and well by their Union."

See United Founder's Life Insurance Company v. Consumers National Life Ins. Co., 447 F.2d 647 (7th Cir., 1971).

3. This is a shorthand designation for the time between January, 1969, and January 31, 1970.

ing employees received greater benefits as a result of having earned less during the out period.

Following our 1970 order, at the request of the union and the company, the court deferred further action in this case pending negotiations toward settlement of all outstanding claims. Following approximately a year of negotiations, National and the I.A.M. entered into an agreement covering nearly 1,000 employees entitled to reinstatement and/or back pay because of National's illegal discharge.

The company agreed to pay each unlawfully discharged employee an amount of compensation calculated by multiplying the average number of hours the employee would have worked had he not been discharged times the claimant's rate of pay.[4] From this figure, interim earnings were deducted. These earnings consisted of wages and compensation from the claimant's employment during the out period as reflected in his 1969 Federal Income Tax Return.[5] During the year's negotiations between the union and the company, the disputes hammered out included: The average amount of overtime likely to be lost at National by I.A.M. members (3% per

member), the number of hours the employees would have worked had they not been wrongfully discharged (an average of 2100 hours), the probable wage progressions of discharged employees, and the minimum out period pay deduction which the company would allow as mitigation against its obligation to compensate the discharged employees ($2700).

This agreement was submitted to the employees with a full explanation of its terms and a statement in dollars and cents of each claimant's compensation if the settlement were approved. The ratification vote showed that 742 favored the agreement, 104 voted against, and 111 did not return their ballots. Following presentation of this proposed settlement to the court, the parties were directed to notify all claimants of a hearing on objections to the settlement. At this time, both groups of intervenors, who had previously submitted memoranda and motions to support their positions, presented their objections to the court.[6]

A principal argument of the Hall intervenors is that Elgin, Joliet and Eastern Railway Company v. Burley, 325 U. S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945) (Burley I) aff'd on rehearing,

4. The variables involved in computation of the claimant's rate of pay were:
   "(a) the claimant's base hourly rate of pay;
   (b) longevity where applicable;
   (c) progression increases where applicable;
   (d) line differential premiums where applicable;
   (e) cost of living increase for January, 1970 in the amount of $.07 per hour;
   (f) a 3% of gross earnings overtime factor (included therein is the overtime premium);
   (g) shift differential of $.12 per hour for all employees who were subject to three shift rotation, and a differential of $.04 per hour for those employees in Base Overhaul who were subject to two shift rotation; and
   (h) pay for holidays normally worked —since 2100 hours include the hours of 8 holidays, those claimants

who normally work all holidays are credited with an *additional* 8 days of holiday premium pay or the equivalent of 96 straight time hours, and the 44 employees in the Stockroom who divide their holiday time are credited with an additional 4 days of holiday premium pay or the equivalent of 48 straight time hours. As to partial claimants, holiday pay and holiday premium pay, where applicable, were computed on a pro-rata basis."

5. *One eleventh of the amount reported on* the 1969 return was added to each employee's interim earnings for 1969 to approximate the amount of earnings for the month of January, 1970.

6. The intervenors were not entitled to an evidentiary hearing since the court received full statements of their claims and heard argument on the merits of each claim.

327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946) (Burley II) precludes the I.A.M. and National from reaching a settlement which binds them. They contend that the collective bargaining representative has no authority to resolve and settle individual claims for back pay which arise from the mass discharge by National. The I.A.M. counters that the rights of the intervenors are part of a major dispute over which it has exclusive jurisdiction notwithstanding *Burley I* and that even if the intervenors' rights are such disputes as were dealt with in *Burley I*, they consented to the resolution of their claims by the union.

■ The distinction between major and minor disputes was discussed at length in *Burley I*. The Supreme Court held that while the collective bargaining representative has the exclusive right the Railway Labor Act to bargain for and bind all employees in its jurisdiction where a major dispute is concerned, it has no such exclusive right to resolve minor disputes pending before the Railway Adjustment Board when these disputes are purportedly settled without notice or an opportunity to be heard by the individual grievant. The essence of this decision was recently noted in Czosek v. O'Mara, 397 U.S. 25, 90 S.Ct. 770, 25 L. Ed.2d 21 (1970):

"The individual employee's rights to participate in the processing of his grievances 'are statutory rights, which he may exercise independently or authorize the union to exercise in his behalf'." 397 U.S. 28, fn. 1, 90 S.Ct. 773.

While categorization of the intervenors' claims might be difficult were *Burley I* the sole guide for the distinction between major and minor disputes,[7] we must adhere to this circuit's decision that back pay issues arising from a major dispute are not minor disputes. United Ind. Workers v. Board of Trustees of Galveston Wharves, 400 F.2d 320 at 327 (5 Cir., 1968).

Moreover, National II was concerned, *inter alia,* with the potential severability as a minor dispute of the claims of a group of discharged strikers who were returned to work before most of the machinists. Holding that these claims were an integral part of the major dispute, we said:

"National urges that any such employee who has lost seniority, pay or other benefits, must 'grieve for his loss . . . . Resort to grievance procedures would only further fragment proceedings already difficult enough and would be inconsistent with the underpinning principle of restoration of the status quo." 430 F.2d at 962.

■ Since the massive discharge of some 1,000 I.A.M. members was a major dispute and restoration of the status quo including back pay is an integral part of this dispute, the intervenors' claims concerning the computation of back pay are not grievances in the *Burley I* sense. Therefore, the I.A.M. had exclusive authority to bargain with the company over treatment of the Hall Group's out period overtime earnings.

The second basis for rejecting these intervenors' claim that the I.A.M. lacked

7. In Burley I, the Court first described major disputes as those relating to the "formation of collective agreements or efforts to secure them" while minor disputes were treated as those concerning the "meaning or proper application of a particular provision [of such agreement] to a specific situation or to an omitted case." 325 U.S. at 723, 65 S.Ct. at 1290. The Court next framed the distinction as those which "present the large issues about which strikes ordinarily arise" versus those "involving grievances, [which] af-

fect the smaller differences which inevitably appear in the carrying out of major agreements and policies or arise incidentally in the course of an employment." 325 U.S. at 723–724, 65 S.Ct. at 1290. Finally the Court distinguished between situations involving the negotiation of prospective agreements and those involving settlement of claims which have already accrued in the past. 325 U.S. at 739, 65 S.Ct. 1282. These distinctions may not we think be congruent in every case.

authority to bargain on their behalf is that they allowed the company and union to negotiate for nearly a year without registering any objections to being bound by whatever agreement was finally reached. As *Burley II* noted:

> "[W]e did not rule, and there is no basis for assuming we did, that an employee can stand by with knowledge or notice of what is going on with reference to his claim, either between the carrier and the union on the property, or before the Board on their submission, allow matters to be thrashed out to a conclusion . . . and then come in for the first time to assert his individual rights." 327 U.S. at 666–667, 66 S.Ct. at 724.

Further amplifying on this point, the Second Circuit observed:

> "The Burley decisions may be said to have held that a carrier may rely on the authority of a union to negotiate a conclusive settlement of an employee's grievance if it can be shown either that the union acted upon the basis of actual authority, whether individually given or to be gathered from the union constitution or by-laws or from custom and usage or that the employee had notice of knowledge of the actions taken by the union in his behalf and took no steps to negate the union's authority." Pyzynski v. New York Central Railroad Company, 421 F.2d 854 at 859–860 (2 Cir., 1970).

The Hall Group first objected to the settlement by a motion to intervene filed on February 25, 1972. By this time, the I.A.M. had spent months negotiating with the company over the method of computation for out period overtime earnings. Long before the final vote was taken registering overwhelming membership approval of the settlement, the Hall Group was aware of these negotiations and the possibility that the I.A.M. might not be able to force the company to agree to less than full deduction of interim earnings from the settlement award. The most probable reason for the delay was that the intervenors thought it more likely that the union could force a concession on this point than that they could obtain one on their own. Moreover, since the company no doubt made concessions in exchange for adherence to its position concerning full deduction of out period overtime, we could not eliminate these claimants from that settlement without overturning the agreement in its entirety. This is exactly the type of situation described in *Pyzynski*. The Hall Group, having allowed the I.A.M. to negotiate with the result that the company bargained under the assumption that all claimants including these twenty-eight would be bound by the settlement, may not now declare that this agreement is null and void with respect to them.

The Hall Group also contends that in computing the benefits to be paid to each prospective claimant under the settlement, the I.A.M. and National failed to utilize the applicable procedures mandated by the *National Airlines II* Court, which said:

> "The persons determined to be entitled to reinstatement must be reinstated with full benefits including back pay. United Industrial Workers v. Board of Trustees of Galveston Wharves, 400 F.2d 320 (5th Cir., 1968), cert. den. 395 U.S. 905, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); Cf. Mungin v. Florida East Coast Railway Company, 416 F.2d 1169, 1177 (5th Cir., 1969). The Galveston case describes both benefits and manner of calculation." 430 F.2d at 961.

This *Galveston* description reads as follows:

> "We believe it is desirable to set out some basic guidelines for the computation of the award. The obvious touchstone is the procedure used by the National Labor Relations Board: Back pay is comprised of the gross earnings which the discharged employee would normally have received during the applicable period less any net interim earnings computed on a quarterly basis with interest." 400 F.2d at 328.

Whatever the computation guidelines are where the court itself is making an award, they do not preclude

the court from approving a settlement by the parties which adopts another method of computation. As was pointed out in *Galveston*, "the amount of back-pay . . . should be resolved without a formal proceeding; that is, through settlement." 400 F.2d at 328, footnote 26. Convinced that this settlement was fairly arrived at through arm's length bargaining, that the method of computation was neither arbitrary nor unreasonable, and that the award was sufficient to insure that the violator of the Act not benefit from its violation, we decline to interfere with the agreement although judicial computation might have differed from the method actually used. Particularly in light of the fact that quarterly computations for 1,000 workers would have been significantly more difficult than were computations based on the yearly tax returns, and that the deductions for interim earnings were given in exchange for a flat rate of postulated overtime which might have been earned at National absent the discharge, we find no infirmity to the method of computation agreed to by the parties.

## II. Reed, Blackett, and Moseley

Walter R. Reed, William P. Blackett, and James A. Moseley, the other intervenors, applied to National Airlines in 1968 as flight engineer trainees. They had been notified to report for training on September 9, 1968, but on August 28 were notified that the training class was cancelled. Later, National advised them that, if they accepted employment as temporary mechanics, they would receive priority consideration for placement in the next training school. As temporary mechanics and members of the I.A.M., they were discharged along with the other plaintiffs in the initial action by I.A.M. against National.

When Reed, Blackett, and Moseley sought to attend the next training school, in July, 1969, National refused to admit them because they had been discharged. After returning in May, 1970, to the company, they attended and completed the training school for June,

1970. As a result of National's refusal to allow them to attend the July, 1969, training school, however, all three allege that they lost seniority as flight engineers. But for this refusal, they argue they would not have been furloughed on March 1, 1971. Since the settlement agreement did not provide for their reinstatement as flight engineers and back pay for their furlough time, they considered it an unsatisfactory resolution of their claims. Reed, Blackett, and Moseley base their primary objection to the settlement upon this portion of the *National Airlines II* decision:

"The District Judge erred in his conception of the mandate of the prior appeal [National Airlines I] by which he was, of course, bound . . . The only matters for him to determine were when the strikers would have returned to work and who had been replaced as of that time, and to enter a direction that those not replaced be reinstated, and to adjudicate the differences, if any, over what reinstatement carried with it . . . . The matter for decision was . . . what it could reasonably be inferred would have happened if the suspensions . . . had been removed as a cause of disaffection . . . . We are concerned with the right of wrongfully discharged employees to a judicially directed reinstatement under the terms of this court's orders." 430 F.2d at 960.

From this language, they conclude that "what reinstatement carried with it" includes compensation for their losses as flight engineers occasioned by their wrongful discharge by National while working as temporary mechanics.

■ The fallacy in this argument is that the I.A.M., which pressed other claims for Reed, Blackett, and Moseley, has no jurisdiction over flight engineers and therefore, could not even purport to resolve such claims with National on their behalf. While these intervenors claim that the settlement "releases NAL and IAM from all claims and matters arising out of the instant suit," the

claims of the intervenors did not arise out of this suit, but merely in conjunction with the same factual occurrences which gave rise to this suit. In holding that these claims were not before it under the mandate of our *National Airlines II* order, the District Court could not have contemplated that this settlement would bar the independent claims these intervenors might have as flight engineers.

With respect to the claims of both groups of intervenors, therefore, the judgment of the district court is affirmed.