**Hector MATOS, Plaintiff,**

v.

**AERONAVES DE MEXICO, S.A., and International Association of Machinists, and Aerospace Workers AFL–CIO, Airline District 146, Defendants.**

**No. 79 C 611.**

United States District Court,
E. D. New York.

Sept. 7, 1982.

Richard M. Gaba, Mineola, N.Y., for plaintiff.

Leonard W. Diamond, Diamond & Hallinan, New York City, for Aeronaves.

John E. Collins, Irving, Tex., for International Ass'n.

## MEMORANDUM & ORDER

PLATT, District Judge.

In this action Hector Matos sues his former employer, Aeronaves De Mexico, S.A. ("Aeronaves") for violation of the collective bargaining agreement and his union, District 146 of the International Association of Machinists and Aerospace Workers ("I.A. M."), for violation of its duty of fair representation. Jurisdiction of this Court is invoked under 28 U.S.C. § 1332 and under the Railway Labor Act, as amended, 45 U.S.C. §§ 151 et seq., extended to airline carriers by 45 U.S.C. §§ 181 et seq. and is not contested.[1]

Plaintiff was discharged from employment as a passenger and sales service representative by Aeronaves on February 9, 1978 for insubordination when he allegedly refused several direct orders to perform the duties of cashier. (Stip. Facts, 1, 3, 5, 9, 10). On February 24, 1968 he returned to work until his suspension and discharge were upheld on March 7, 1978, after a three-hour hearing attended by the plaintiff, the hearing officer, the Assistant General Chairman of District 146, I.A.M., the airport union shop steward (both representing plaintiff),

---

1. It is now well established that the federal courts, not the railroad adjustment boards, have jurisdiction over actions by employees to enforce the union's duty of fair representation. *Glover v. St. Louis-S.F.R.R. Co.,* 393 U.S. 324, 89 S.Ct. 548, 21 L.Ed.2d 519 (1969); *Simberlund v. L.I.R.R.,* 421 F.2d 1219 (2d Cir. 1970). This duty protects against all forms of hostile discrimination and applies in the negotiations of both major and minor (discharge grievances are minor) disputes. *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). We also have jurisdiction over plaintiff's breach of contract claim against Aeronaves where, as here, plaintiff's failure to exhaust his contractual remedies is a consequence of the union's refusal to take his case to arbitration. *Vaca v. Sipes, id.; Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 96 S.Ct. 1048, 1057, 47 L.Ed.2d 231 (1976).

a company representative and several company employees.[2]

Defendant I.A.M. contends that through its efforts plaintiff was able to return to work after his suspension and discharge, (a right not available under the collective bargaining agreement) pursuant to an agreement between all parties that the hearing on March 7, 1982 would be final and binding. Plaintiff alleges that he was not aware of any such agreement when he returned to work or at the subsequent hearing, and first became aware of said agreement when his union thereafter refused to proceed to arbitration with his wrongful discharge grievance.[3] He claims that his discharge was without just and sufficient cause because he provided reasonable grounds for his refusal to perform as cashier (lack of proper training) and suggested to the company lawful alternatives (another employee qualified as a cashier was on duty) and that for these reasons Aeronaves should have imposed a less harsh punishment than discharge. (Stip. Facts 4).

Plaintiff seeks money damages for back pay and related benefits, counsel fees, and reinstatement to his former job with Aeronaves. After consideration of all the evidence adduced at a bench trial conducted on November 30, 1981, December 1, 1981 and January 14, 1982, we find plaintiff's claims to be without merit.

Before trial the parties stipulated to the following facts:

1) Plaintiff, Matos was employed by Aeronaves as a "Passenger Sales and Service Representative-Airport" during the dates set forth in the complaint * and that such employment was subject to the terms, conditions and provisions of a collective bargaining agreement between the respective defendants, Aeronaves and I.A.M.

2) That as a "Passenger Service and Sales Representative-Airport", the duties of the plaintiff were, inter alia,

He shall sell and issue tickets at the airport, answer telephones, and provide information, make reservations at the airport, collect fares including excess baggage charges. He shall calculate and issue ticket refunds and prepare documents related to credit sales. He shall be responsible for the petty cash and accountable forms provided to him by the company. The agent shall be responsible for all monies collected in any form along with the accountable forms reports. He shall turn the money and above described documents over to the supervisor in charge of his shift. The supervisor shall give the agent a receipt for the money and documents received. He shall make all the sales reports from his work, prepare and transmit a transmittal form for tickets. He shall convey messages to passengers and other necessary agencies and process all lost and found articles and damaged baggage claims. The agent shall be capable of performing as agent in control of each flight. Such agent in control shall be responsible for effective utilization of seating capacity for the flight.

He shall perform routine duties pertaining to his job description. He must be familiar with and have sufficient knowledge with tariffs applicable to the transportation he sells and with rules and regulations pertaining to such air travel.

3) On February 9, 1978, at approximately 3:30 P.M. while Matos was on duty, Aeronaves Assistant Station Manager Velarde verbally told Matos to act as cashier, which was one of the duties specified for Matos' job classification as set forth in Paragraph 2 above.

4) Plaintiff informed Velarde he had not been properly trained for cashier duty and that he would rather not be required to perform the duty and that other competent personnel were available.

5) Velarde told plaintiff Matos to either take up the duties of cashier or punch out and go home.

---

**2.** Stip. Facts 15; Plaintiff's Ex. 6, letter to Mr. Matos from Mr. Carlos M. Gutierrez, hearing officer, Divisional Manager, U.S.A. & Canada, dated March 13, 1978.

**3.** Tr. I–59, 60.

6) That Grievance Procedures were provided for in the Collective Bargaining Agreement.

7) (a) That Article XVIII(A)(12) of the Collective Bargaining Agreement provides, "It is understood and agreed that the Company has the right to discipline or discharge an employee for just and sufficient cause within ten (10) days of learning of any evidence of wrong-doing on the part of such employee."

(b) That Article XVIII(A)(13) of the Collective Bargaining provides, "No employee under the terms of this Agreement, who has been in the service of the Company for more than ninety (90) days will be disciplined to the extent of loss of pay, suspended or discharged without first having the benefit of a fair and impartial meeting with a Union official present, except employees involved in stealing, under the influence of drugs and/or alcohol, sabotage, fighting on the job, or refusal to follow a direct order."

8) During February 9, 1978 as a result of the incident with Velarde, plaintiff contacted his union representatives, the same being those of defendant I.A.M., and informed them of his problem.

9) At no time on February 9, 1978, did plaintiff perform duties of cashier in compliance with the order given by Velarde.

10) That on February 10, 1978 plaintiff was notified by Aeronaves' station manager, one Roesslein, in writing, that his employment was terminated for having refused a direct order to perform as cashier.

11) That as a result of receiving notice of termination, plaintiff, pursuant to the terms of the collective bargaining agreement, was off payroll and defendant was not obligated to accept his services if preferred.

12) On February 13, 1978, the defendant, I.A.M. sent a letter to defendant Aeronaves concerning the failure by Aeronaves to train cashiers properly.

13) On or about February 24, 1978, following conversations between representatives of the two defendants, Matos was permitted to return to work by Aeronaves until a final hearing and decision on his dismissal.

14) On February 24, 1978, upon his return to work at Aeronaves, plaintiff signed the following statement, "I, Hector Matos, concur to return to work at Aeromexico until a final hearing and decision will be held regarding my dismissal."

15) A meeting was held on March 7, 1978 at which Carlos M. Gutierrez, Divisional Manager for Aeronaves acted as hearing officer. Among others present were Earl G. Kehoe, Industrial Relations Counsel for Aeronaves; James Haga, Assistant General Chairman of I.A.M. John Tague, Shop Steward for I.A.M.; the plaintiff, Hector Matos; Henry F. Velarde, Assistant Station Manager for Aeronaves and Cruz Fernandez, passenger sales and service supervisor for Aeronaves.

16) At the aforesaid meeting testimony was taken, evidence produced and those present had the opportunity to examine and cross-examine.

17) After the conclusion of the aforesaid meeting, Carlos M. Gutierrez verbally upheld the dismissal of Matos and subsequently issued his decision to that effect in writing.

18) That upon receipt of the meeting's results, plaintiff Matos submitted an appeal from the decision.

19) That by letter dated March 17, 1978, Haga informed plaintiff that the Union would not proceed with processing plaintiff's grievance.

20) That on March 29, 1978 Haga, by letter, refused to process the grievance.

21) Matos had not served as cashier between October 29, 1977 and February 9, 1978; a period of over three months.

22) On February 9, 1978 during the shift when Matos was working, there was one departing flight and two arriving flights.

23) Matos worked for Aeronaves from October 24, 1976 to March 7, 1978, a period of almost a year and one-half with no prior disciplinary record or warnings.

24) Matos' experience as a cashier consisted of four months working at a hotel night club cash register in 1962, and his job with Aeromexico [Aeronaves] where he performed services as cashier on various occasions during his employment. If he was cashier on a morning flight, it was for about an hour until the flight went out. If it was on the evening shift, he was cashier from 4:00 P.M. until the flight left.

25) By letters dated November 11 and November 14, 1977, plaintiff was directed by defendant, Aeronaves, to correct certain administrative errors which he had made while serving as cashier and said letters imposed no penalty or discipline on plaintiff Matos.

26) Article IV of the collective bargaining agreement between Aeronaves and I.A.M. sets forth the duties of the Passenger Sales and Service Supervisor. In part, the agreement provides:

"A Passenger Sales and Service Supervisor is directly responsible...for directing and coordinating as necessary the work of the Passenger Sales and Service Agent personnel assigned to his tour of duty."
"He shall be capable of *and* provide training and instructions to all passenger sales and service agents as required." (Emphasis supplied)
"He shall investigate any irregularities pertaining to the work of agents under his supervision and shall report same to the Station Manager or his designee."

27) Earl G. Kehoe, Industrial Relations Counsel for Aeronaves agreed that [in] a hearing or an arbitration involving a case such as this case, the hearing officer or arbitrator had authority to review the penalty as well as the finding of guilt or innocence.

28) The agreement alleged by Aeronaves to have been made between it, the I.A.M. and Matos, provided that if the hearing officer, Carlos M. Gutierrez, a divisional manager for Aeronaves, found that Matos disobeyed a direct order then the dismissal would be upheld.

29) The alleged agreement between I.A.M. and Aeronaves took place prior to the hearing on March 7, 1978, and in substance provided that the decision by Gutierrez would be final and binding on all parties.

30) On February 9, 1978, Jim Haga told Matos over the telephone to perform his duties as cashier.

* October 24, 1976 to February 10, 1978; and February 24, 1978 to March 7, 1978.

I

■ "A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967); *Ruzicka v. General Motors,* 649 F.2d 1207 (6th Cir. 1981). Conduct is arbitrary if it is without a rational basis, *Robesky v. Qantas Empire Airways Limited,* 573 F.2d 1082 (9th Cir. 1978), but negligent conduct or poor judgment, without more, is not enough to breach the duty of fair representation. *Bazarte v. United Transportation Union,* 429 F.2d 868, 872 (3d Cir. 1970). However, to fail to investigate a meritorious grievance or to process it in a perfunctory fashion may be arbitrary. *Vaca v. Sipes, supra; see also, Hines v. Anchor Motor Freight,* 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976). Unintentional acts or omissions may be arbitrary if they reflect reckless disregard for the rights of the individual employee. Nondisclosure of information to the employee, resulting particularly in the loss of employment, has been a factor in holding that the duty of fair representation has been breached,[4] but the Second Circuit has held that evidence of bad faith is required in a nondisclosure case to show a breach of the duty of fair representation. *Pyzynski v. New York Central Railroad,* 421 F.2d 854 (2d Cir. 1970).

■■ Under the Railway Labor Act, extended to air carriers by 45 U.S.C. §§ 181 et

---

4. *See Minnis v. U.A.W.,* 531 F.2d 850, 854 (8th Cir. 1975); *Harrison v. United Transportation Union,* 530 F.2d 558, 562 (4th Cir. 1975); *Ruzic-* ka v. General Motors, 523 F.2d 306, 310 (6th Cir. 1975).

seq., all parties are required to try to settle a dispute before invoking the formal arbitration procedures for either major or minor disputes. *Elgin, Joliet & Eastern Railway Co. v. Burley,* 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945), *on rehearing,* 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946). An employee has no absolute right to have his grievance arbitrated:

> ... In providing for a grievance and arbitration procedure which gives the union discretion to supervise the grievance machinery and to invoke arbitration, the employer and the union contemplate that each will endeavor in good faith to settle grievances short of arbitration. Through this settlement process, frivolous grievances are ended prior to the most costly and time-consuming step in the grievance procedures. Moreover, both sides are assured that similar complaints will be treated consistently, and major problem areas in the interpretation of the collective bargaining contract can be isolated and perhaps resolved. And finally, the settlement process furthers the interest of the union as statutory agent and as coauthor of the bargaining agreement in representing the employees in the enforcement of that agreement.... 

> If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation.

*Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 917, 17 L.Ed.2d 842 (1967).

■ Nor does a union breach its duty of fair representation merely because it settled the grievance short of arbitration. *Id.* 87 S.Ct. at 918–19.

## II

■ Plaintiff first asserts that the union acted in bad faith and in an arbitrary and capricious manner when it agreed with defendant Aeronaves to waive its right to arbitrate plaintiff's discharge *prior* to the March 7, 1978 hearing. He argues that the union acted arbitrarily and in bad faith because once it waived arbitration, plaintiff clearly lost any possibility of receiving a fair and impartial hearing and decision, from a hearing officer who was a company official. The affiliation of the hearing officer, Mr. Gutierrez, with Aeronaves, does not compel a conclusion that he was incapable *per se* of conducting a fair hearing.[5]

Moreover, prior to the hearing, the union appears to have made not an arbitrary, but a well-considered decision, with the plaintiff's best interests in mind, when it requested that Mr. Gutierrez act as the hearing officer. Mr. L. T. Faircloth, international representative for I.A.M., testified that prior to any agreement about the proposed final and binding nature of the hearing, he specifically negotiated with the company representative, Mr. Earl Kehoe, for the assignment of Mr. Gutierrez as the hearing officer. He did so because in his dealings with all the major carriers, Mr. Gutierrez in his opinion was one of the fairest men in regards to his employees. (Tr. III–41, 42). Mr. Jim Haga, a District 146 I.A.M. representative, testified that he had submitted several cases to Mr. Gutierrez which were decided favorably for the union. (Tr. III–13, 21).

Plaintiff appears to make no allegations that once it occurred, his hearing was unfair or that the hearing officer, Mr. Gutierrez, exhibited bias against him because of the hearing officer's position as a company officer. The record in no way supports such a finding. At the hearing Mr. Matos was represented by two union officials, Mr.

---

5. *Cf. Wells v. Southern Airways,* 616 F.2d 107, 110 (5th Cir. 1980) (Railway Labor Act prohibits exclusion of arbitrator based on connections to the parties and imposes a duty to act fairly without regard to institutional affiliations. Union's choice of representatives cannot be said to have worked an injury upon employee-grievant unless the choice can be shown to have affected the fairness and reliability of the adjudicatory process. *See also,* Article XVIII, Grievance Procedure of the collective bargaining agreement, Appendix I.

Jim Haga, Assistant General Chairman of District 146, I.A.M., and Mr. John Tague, the airport union shop steward, and he was given the opportunity to testify and cross-examine all witnesses.[6] Mr. Gutierrez had never met the plaintiff prior to the hearing. In fact, Mr. Matos had very little complaint about the way his hearing before Mr. Gutierrez was handled. (Tr. I–96–97).

■ The Third Circuit has clearly characterized the informal nature of the arbitration process.

> "There must also be, however, due regard for the fact that both advocates and the tribunal members are laymen, unlikely to be impressed by evidential nuances and cumulative testimony dear to the heart of trial advocates. If the panel had the essential facts before it, a decision adverse to the employee does not establish a breach of duty of fair representation, even if a court would have come to a different conclusion in passing on the merits of the grievance."

*Findley v. Jones Motor Freight, Division Allegheny Corp.,* 639 F.2d 953, 964 (3d Cir. 1981). The hearing appears to have been conducted in a fair, impartial manner and the plaintiff has not alleged otherwise. The mere fact that the hearing officer, Mr. Gutierrez, was Divisional Manager for the United States for Aeronaves does not establish that the union acted arbitrarily in its negotiations with Aeronaves or in any way that would constitute a breach of its duty of fair representation.

### III

The gravamen of Mr. Matos' suit is that he was never consulted or informed by the officials of his union that they had waived the union's right to proceed to arbitration in order to enable him to return to work prior to the hearing. (Tr. I–56, 58). The weight of the evidence adduced at trial does not support his contention. Plaintiff is the only witness who testified that he was not informed or aware (either prior to his return to work on February 24, 1978 or at the hearing on March 7, 1978) that the March 7, 1978 hearing was "final and binding" on all parties. We are unable to credit his claim in light of all the evidence in this case, including without limitation, the *quid pro quo*[7] which the plaintiff received for his agreement to be bound by the hearing officer's decision. (*See also* collective bargaining agreement, Appendix I).

In the first place, the evidence indicates that it was Mr. Matos' complaints of financial need[8] to his union representatives that spurred the union into negotiating with Aeronaves about getting him back to work. (Tr. III–17, 19, 25). From February 10, 1978, when he received Mr. Roesslein's letter informing him he was discharged, plaintiff was "off-payroll" and had no right under the collective bargaining agreement to return to work prior to the hearing. (Stip. Facts 11). Mr. Jim Haga, Assistant General Chairman of I.A.M.'s District 146, who was in charge of handling Mr. Matos' grievance, testified that the union agreed to waive arbitration, a very "unusual" procedure, precisely because Mr. Matos needed "financial relief" and wanted to return to work as soon as possible. (Tr. III–24, 25). He testified that he made it clear to Mr. Matos that a final and binding hearing was not "run of the mill" and that Mr. Matos could return to work only if he agreed that the hearing would be final and binding.

---

**6.** *See* footnote 2, supra.

**7.** The consideration for the agreement that the hearing be final and binding was (i) his choice of Mr. Gutierrez as the hearing officer, (ii) his right to return to work pending the hearing and any decision thereon and (iii) a foreshortened grievance process or an expedited hearing as against a longer process when he would have been out of work.

**8.** Mr. Matos' desire to return to work in order to gain merely two weeks of additional pay, may not be as strange as he now contends. He may have hoped to get back in the good graces of his employer before the hearing. Just as any alleged wrongdoer hopes to be given an opportunity pending his hearing to show his stability or rehabilitation, Mr. Matos may have hoped to show his superiors prior to the hearing that he was in fact a cooperative and diligent employee who was too good to lose and that the events of February 9, 1978 were an aberration and not a basis for his discharge.

(Tr. III–8, 9, 29). He also informed plaintiff that Aeronaves, prior to allowing him to return, probably would ask him to sign a letter agreeing and acknowledging that the March 7, 1978 hearing was to be final and binding. (Tr. III–8, 9, 34).

Mr. Mike Roesslein, the Aeronaves station manager, testified that he also explained this to Mr. Matos on February 24, 1978 before Mr. Matos returned to work. (Tr. II–77, 79). The union shop steward, Mr. John Tague, also knew that plaintiff was returning to work and that his hearing would be final and binding. (Tr. III–61). Mr. L. T. Faircloth, international representative for I.A.M., testified about the negotiations between the union and Aeronaves in their efforts to get Mr. Matos back to work. He indicated that it was Mr. Kehoe, an Aeronaves representative, who insisted that Mr. Matos must personally agree to the agreement before he returned to work. (Tr. III–41–44).

Mr. Matos' contention is even more strongly belied by the statement he signed on February 24, 1978 prior to returning to work:

"I, Hector Matos concur to return to work at Aeromexico until a final hearing and decision will be held regarding my dismissal."

(Stip. Facts 13, 14) (Plaintiff's Ex. 9). We have difficulty imagining another explanation for the company's insistence that Mr. Matos sign such a statement before returning to work other than the existence of an agreement between the parties.

The record also shows that Mr. Gutierrez, the hearing officer, explained once again at the beginning of the hearing that his decision would be final and binding. (Tr. III–34). And Mr. Haga testified that while the hearing was in progress he did not promise Mr. Matos that he would take the case to arbitration if Mr. Gutierrez's decision upheld the discharge.[9]

■ Even if we found in the alternative, that plaintiff did not know or understand that the hearing and decision were final and binding on all parties, the law of agency probably allows us to find that Mr. Matos was bound by the agreement anyway. Mr. Matos has failed to prove that any company or union official acted with personal animosity or hostility or in bad faith.[10] *In Pyzynski v. New York Central R.R. Co.,* 421 F.2d 854 (2d Cir. 1970), the

---

**9.** Mr. Haga testified that after the hearing, he did not promise Mr. Matos he would take his case to arbitration. He said, in response to a question from Mr. Matos about what he would do if they ruled against him, "I would take it back and discuss it with Mr. Faircloth and proceed on any advice ... We were both very aware of the deal. I was very concerned with trying to get the man back to work. I knew he had some problems. I thought maybe if I talked to Faircloth he could tell me of some other way, appeal to the company or appeal to Mr. Gutierrez on his decision, anything. I just hated to lose him." (Tr. III–30–31).

**10.** Plaintiff attempted to prove that Mr. Velarde, Assistant Station Manager of Aeronaves and one of plaintiff's supervisors, was hostile toward him and that plaintiff's alleged insubordination was an excuse, a pretense, to fire him. Plaintiff introduced a copy of the February 10th letter to Mr. Matos discharging him signed by Mr. Roesslein. On the top was handwritten "L. Ortiz, for your information" and at the bottom, "Two more to go yet." (Plaintiff's Ex. 5). Mr. Eulogio Ortiz, the other Assistant Station Manager for Aeronaves, testified that the handwriting was that of Mr. Velarde (Tr. III–131). Mr. Ortiz testified he had known Mr. Matos for over eleven years, having worked with him previously at another airline. He indicated that the phrase "Two more to go yet" referred to two other employees of Aeronaves whom they wanted to get rid of (Tr. I–32). In direct contradiction of plaintiff's contention, Mr. Ortiz testified that Mr. Velarde had never spoken to him "about getting rid of Hector Matos." (Tr. I–32).

Mr. Velarde testified he had no recollection of what he meant by the phrase, "Two to go yet." He testified that he wasn't aware of a "hit list" or that Mr. Roesslein was going to try to fire certain people. (Tr. II–34). We note that the phrase "Two to go yet" was written after Mr. Matos was fired and without more, does not prove that Mr. Matos' supervisors had been scheming as to how to get rid of him or had used the subordination incident as an excuse to fire him. Mr. Ortiz testified that he and Mr. Velarde discussed employees frequently and that he knew which employees were on the verge of being dismissed or disciplined. (Tr. I–31). His testimony that Mr. Velarde never discussed with him getting rid of Mr. Matos serves to refute plaintiff's contentions of bad faith on the part of Mr. Velarde.

Second Circuit held that in the absence of proof of bad faith, a union member was bound by an agreement with his employer

Mr. Haga, Assistant General Chairman of District 146, I.A.M., testified that he had no hostile or unkindly feelings toward plaintiff, (Tr. III–23–4), even though plaintiff attempted to show Mr. Haga was very angry with Mr. Matos for having filed a grievance concerning overtime (prior to the incidents of the case at bar). In fact, Mr. Haga reminded plaintiff's attorney at trial that plaintiff's attorney had needed to refresh Mr. Haga's memory of the overtime grievance at the deposition.

**11.** The facts of the *Pyzynski* case resemble the facts of the case at bar:

In November 1959, Pyzynski, an employee of the New York Central, was injured in the course of his employment. Claiming permanent and total disability, Pyzynski brought suit against the Railroad and another party on whose property the accident occurred. This suit resulted in a verdict in his favor.[1] Thereafter, in December 1961, Pyzynski, feeling himself sufficiently recovered to return to work, applied for and was granted a physical examination by one of the Railroad's doctors. Although the examining physician found appellee fit for train service, the Railroad's medical director ruled against returning him to work.

Pyzynski, a member of the Brotherhood of Railroad Trainmen, consulted with Brotherhood officials concerning the action of the Railroad, and the Brotherhood instituted grievance procedures on appellee's behalf. Negotiations passed through the various stages, finally culminating in the presentation of Pyzynski's case to the Special Board of Adjustment No. 387, a system board created by agreement between the Brotherhood and the Railroad pursuant to Section 153, Second, of the Railway Labor Act.[2] On December 3, 1963, the Board ruled that appellee should be examined by a board of three doctors and, if found physically fit, that he be restored to train service and compensated at the applicable job rate from May 10, 1962 until the date of his return to work. The result of this medical examination was unfavorable to appellee. However, in January 1965, upon petition of the Brotherhood, the Board reopened the case and issued what was termed a "ruling on interpretation," [3] directing a reexamination of appellee by a neutral physician. This ruling was based on a finding that the Railroad had improperly submitted to the doctor who first examined Pyzynski information concerning Pyzynski's prior testimony in his personal injury action as to his total incapacitation. The Railroad objected to the reopening of the case and refused to honor the ruling on interpretation.

negotiated by his union on his behalf even in the face of his claims that he was not fully informed.[11] The *Pyzynski* decision

Thereafter, numerous discussions and exchanges of correspondence took place between the Railroad and the Brotherhood and the Brotherhood and Pyzynski. Although there is considerable dispute as to what settlement Pyzynski authorized the Brotherhood to make, the upshot of these negotiations was that the Brotherhood and the Railroad agreed that if Pyzynski could pass a physical examination he could return to work, but without back pay. Appellee finally passed this examination and returned to work in July 1965.

In December 1965, appellee instituted this suit in the United States District Court for the Western District of New York to enforce the award of the Special Board, seeking specifically to enforce that part of the award which directed the Railroad to compensate Pyzynski for back pay for the period from May 10, 1962 until the date of his return to work.

*Id.* at 856–57. (Footnotes omitted.)

Turning to evidence adduced at trial in the present case we find that after the Railroad refused to recognize the second award of the Special Board, Pyzynski's case was the subject of discussion at a meeting of a number of Brotherhood officers on May 8, 1965. The Local Chairman of the Brotherhood, Mr. Herr, discussed the result of this meeting with Pyzynski and procured from Pyzynski an authorization for settlement at no less than 50% of back pay. A report of this discussion and the signed authorization were embodied in a letter sent by Herr on May 10, 1962 to Mr. Weil, the Vice-President of the Brotherhood and Mr. Kenefick, the General Chairman.

Several days later, however, Pyzynski wrote a personal note to Kenefick. The letter shows that Pyzynski was by now quite desperate to get back to work, and he requested "If you can get *any kind* of settlement please do so. Get me back to work." This statement, especially when read in the context of the entire letter, could quite reasonably be interpreted as evincing Pyzynski's intention to withdraw all conditions previously attached to the authority given the Brotherhood to settle.[9] On the witness stand, however, Pyzynski asserted that he had not meant to abandon the condition that he receive 50% of back pay.

Following the receipt of this letter, Weil wrote to Herr and Pyzynski, suggesting that the conflict between Pyzynski's two statements be resolved by sending to Weil and Kenefick the following telegram over Pyzynski's signature: "I am agreeable to accepting an offer for return to service, without any

rested in large measure on the reasoning of the Supreme Court in *Elgin, Joliet & Eastern Railway Co. v. Burley,* 327 U.S. 661, 66 S.Ct. 721, 723, n.7, and 723–24, 90 L.Ed. 928 (1946):

> "Even the ordinary law of agency attributes authority to a representative to act when the principal stands by with knowledge or notice of his assumption of that authority and permits the third person to act to his injury upon the same assumption." . . .

> " . . . we did not rule . . . that an employee can stand by with knowledge or notice of what is going on with reference to his claim . . . between the carrier and the union on the property . . . [and] allow matters to be thrashed out to a conclusion by one method or the other, and then come in for the first time to assert his individual rights."

We would apply the same reasoning to plaintiff's case. Mr. Matos authorized the union to act on his behalf.[12] At no

restrictions, without, repeat, without pay for time lost provided such settlement can be negotiated." A telegram to this effect was subsequently prepared and sent.[10] Although Pyzynski admitted to receiving the letter requesting the telegram, he testified that his subsequent authorization of the requested telegram was non-specific and contemplated only the sending of *a* telegram. In fact, he has persisted in insisting that at no time did he authorize the relinquishment of his claim for back pay.

In any event, following the receipt of this telegram, the Brotherhood met on May 21, 1965 with Mr. Fee, a vice-president of the Railroad. At this time, the Brotherhood offered in compromise that the Railroad permit Pyzynski to go back to work without back pay. The Railroad, on June 28, 1965, counterproposed that Pyzynski be accepted back to work without back pay if he could pass a physical examination. The Brotherhood agreed to settlement on these terms, and a medical examination was set for July 15. On that date, and prior to the medical examination, Pyzynski met with Kenefick and a representative of the Railroad. Kenefick testified that he explained the terms of the settlement to Pyzynski at that time, including the understanding that "there was no lost time involved in the case," and that Pyzynski made no objection. Although the Railroad's representative did not recall that the terms of the settlement were discussed while he was present, he testified that on the basis of his conversations with Pyzynski he was left with the impression that Pyzynski was satisfied with the arrangement made. Once again, however, Pyzynski's testimony is in conflict. Indeed, he denied at trial that the terms of the settlement were ever explained to him.

The Railroad's evidence established that in its negotiations with the Brotherhood and its acceptance of the Brotherhood's proposal to reinstate Pyzynski without back pay it relied on the reasonable assumption that the Brotherhood was acting on Pyzynski's behalf.

9 The full text of Pyzynski's letter follows: "Dear Sir and Brothers:

As of the letter of May 10, I some more trouble. My wife had a nerves (sic) break-

down May 12. I had to take her to a hospital. I don't know how long she will there. The bills are over head and I don't know which to move. I have to get a loan on the house. She has been sick for the last three years. I talked to Mike Herr on the telephone and he said he tried to get in touch with you two or three times couldn't reach you. 'If you can get *any kind of settlement* please do so.' Get me back to work. I am sorry for giving you all this trouble Joe. Thank you.

/s/ Stanley Pyzynski
Will you please answer me."

10 The final wording of the telegram sent was as follows:

"I am agreeable to accepting an offer for return to service without any restrictions, without time lost provided such settlement can be negotiated

S. Pyzynski"
*Id.* at 860–61.

The Court then held that the plaintiff had clearly acquiesced in the actions taken by his union, having presented himself for the physical examination that was the basis for his return to work and having in no way initiated negotiations on his own, and relying on the union to press his grievance. The Court noted that "negotiations and correspondence between Pyzynski and the Brotherhood show that the Brotherhood had reasonable grounds for assuming it acted with Pyzynski's assent." *Id.* at 861. It further held that as a matter of federal law, the union, as the plaintiff's agent, was vested with the authority to make the settlement:

The grievance procedures can function as contemplated by the Act only if the carrier is able to rely on the authority of the union to negotiate a conclusive settlement—a settlement which is binding on the employee unless the union has breached its duty of fair representation or unless the employer itself has engaged in fraudulent conduct.
*Id.* at 865.

12. In fact Mr. Matos first telephoned the union in the midst of the events of February 9, 1978,

time did he attempt to initiate personal negotiations with Aeronaves and at no time did he take any steps to negate the union's authority. *See Elgin, J. & E. Ry. Co. v. Burley, supra,* 66 S.Ct. at 723; *Pyzynski v. New York Central R.R. Co.,* 421 F.2d 854, 861 (2d Cir. 1970). He was fully aware that the union was negotiating with Aeronaves and he spoke several times with union representative Jim Haga (Tr. III–30–34) as well as his union shop steward, Mr. John Tague. (Tr. III–41). He received the benefits of the bargained-for-accommodation, a return to work prior to the hearing, as well as a choice of the hearing officer and an expedited hearing. In the absence of any bad faith exhibited by the union, plaintiff may not now seek to avoid that part of the agreement that provided that the hearing was to be final and binding. Having received the benefits of the bargain, he may not now complain that he was unaware of the agreement under which the benefits were conferred.[13]

 Plaintiff's contention that the agreement to waive arbitration is invalid because the collective bargaining agreement does not empower the union or Aeronaves to agree that a hearing may be final and binding is without merit. Under the terms of the collective bargaining agreement plaintiff could not have returned to work prior to the hearings either. (Stip. Facts 11). Mr. Matos does not have a right to compel arbitration of his grievance. *Vaca v. Sipes, supra.* A union must be accorded "a wide range or reasonableness" to enable it to perform effectively, as long as such discretion is exercised in "good faith and honesty of purpose." *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 96 S.Ct. 1048, 1056, 47 L.Ed.2d 231 (1976). The union's broad authority in negotiating and

administering effective agreements is "undoubted." *Humphrey v. Moore,* 375 U.S. 335, 84 S.Ct. 363, 368, 11 L.Ed.2d 370 (1964). "Collective bargaining is a continuing process. Among other things, it involves day-to-day adjustments in the contract and other working rules, resolution of new problems not covered by existing agreements ..." *Conley v. Gibson,* 355 U.S. 41, 46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). A variation from the literal terms of a collective bargaining agreement does not show in this instance a violation of the union's duty of fair representation.

Plaintiff has failed on all counts to show that the union's conduct was arbitrary, discriminatory or in bad faith.

### IV

Plaintiff in his claim against Aeronaves for breach of the collective bargaining agreement invites this Court to review and overrule the decision of the hearing officer, Mr. Gutierrez, upholding the suspension and discharge of Mr. Matos for insubordination. He not only challenges the finding of the hearing officer that he refused several times to perform the duties of cashier on February 9, 1978, but urges that Aeronaves should be constrained from imposing such a harsh penalty as discharge. This we may not do.

 Having failed to prove the Union breached its duty of fair representation or to allege that Aeronaves was implicated in the Union's alleged malfeasance, plaintiff may not maintain a suit against his employer Aeronaves for wrongful discharge:

> ... the wrongfully discharged employee may bring an action against his employer ... provided the employee can prove that the union as bargaining agent breached

---

seeking advice. Mr. Haga advised him to perform his duties as cashier. (Stip. Facts 8, 30).

**13.** The facts of *Robesky v. Quantas Empire Airways,* 573 F.2d 1082 (9th Cir. 1978), are clearly distinguishable from those of the case here. In *Robesky,* the aggrieved employee turned down an offer of settlement from her employer which she testified she would have accepted had she been informed by her union ⠶

that the case would not be processed to arbitration. In plaintiff's case he turned down not the right to arbitration, but the right to have the union consider taking his case to arbitration. Neither was there testimony by plaintiff that he would not have accepted the offer to return to work prior to the hearing, had he known the hearing was to be final and binding.

its duty of fair representation in its handling of the employee's grievance.

*Vaca v. Sipes, supra,* 87 S.Ct. at 914. *Accord, Freeman v. O'Neal Steel, Inc.,* 609 F.2d 1123, 1128 (5th Cir. 1980) (Because we find that the union's failure to pursue arbitration was not a breach of fair representation, we need not decide whether the discharge was a violation of the employment contract.); *Pyzynski v. New York Central R.R. Co., supra,* at 865 ("As a matter of law one of these wrongful actions must be found to have occurred before an employee can sue his employer on a contract claim which has already been negotiated to a settlement between the employer and the employee's collective representative, purporting to act on his behalf.")

■ Aeronaves is entitled to rely on plaintiff's and the union's agreement that the decision of the hearing officer would be final and binding, absent proof of bad faith. *See Elgin, Joliet & Eastern Railway Co. v. Burley,* 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945), *on rehearing,* 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946); *Vaca v. Sipes, supra; Pyzynski v. New York Central R.R. Co., supra.* Just as Mr. Matos received the benefits of the bargained-for-accommodation so should Aeronaves receive theirs—that the finding of the hearing officer would be final and binding.

■ If we were not precluded from examining the merits of plaintiff's grievance, we would certainly hold that the trial record supports the hearing officer's finding that Mr. Matos refused a direct order to perform as cashier several times.[14] At no time on February 9, 1978 did plaintiff perform the duties of cashier. (Stip. Facts 7). Plaintiff's job description, as specified in Article IVB of the collective bargaining agreement (Stip. Facts 2) included the duties of cashier. (*See also* Appendix I). The record indicates that plaintiff performed as cashier during his former employment and that he had acted as cashier for Aeronaves on more than forty previous occasions with approximately ninety-six percent efficiency. (Defendant's Ex. 2; Stip. Facts 23, 24). The collective bargaining agreement, Article XVIIIA(12) and (13) (Stip. Facts 7) clearly provides that Aeronaves may suspend or discharge an employee for refusal to follow a direct order. (Appendix I). Defendant Aeronaves' suspension and discharge cannot be said to have been without just and sufficient cause.

## V

Plaintiff has failed to establish that his union, I.A.M., breached its duty of fair representation. The record shows that I.A.M. representatives diligently negotiated with Aeronaves in good faith and as a result of their efforts, Mr. Matos, in return for agreeing that the hearing was to be final and binding, received several benefits not otherwise available under the collective bargaining agreement: 1) he returned to work prior to his hearing; 2) the hearing officer was chosen by his union, I.A.M., and 3) he was able to skip to step three of the grievance procedure, avoiding the necessity of filing a written grievance and thus have an expedited hearing, a procedure not normally provided under the collective bargaining agreement. (*See* collective bargaining agreement, Appendix I).

■ Such a bargained-for-accommodation is within the union's discretion to negotiate. Settlement of minor grievances short of arbitration is encouraged by the Railway Labor Act. *Vaca v. Sipes, supra.* In fact, Mr. Matos and the union did not bargain away his right to take his grievance to arbitration since an employee-grievant may not compel his union to arbitrate his grievance. He merely lost his right to have the union decide in its discretion whether to take his grievance to arbitration. I.A.M.'s conduct was not in any way arbitrary, discriminatory or in bad faith. Since the plaintiff failed to show a breach of the duty of fair representation or any collusion between Aeronaves and I.A.M., Aeronaves is entitled to the benefit of its bargain—the

---

**14.** Stip. Facts 5; testimony of Mr. Fernandez, Tr. I–22, 23, 25; testimony of Mr. Roesslein, Tr. II–60–62; testimony of Mr. Velarde, Tr. II–109–111, 117.

finality of the hearing officer's decision upholding the discharge of Mr. Matos as with just and sufficient cause.

Having considered all of the evidence presented, for the foregoing reasons plaintiff's suit against his former employer, Aeronaves De Mexico, S.A., for violation of the collective bargaining agreement and against his union, I.A.M., for breach of its duty of fair representation, must be, and hereby is, dismissed.

SO ORDERED.

## APPENDIX I

Relevant Parts of Collective Bargaining Agreement

AGREEMENT

BY AND BETWEEN

AERONAVES DE MEXICO, S.A.

and

INTERNATIONAL ASSOCIATION OF MACHINISTS

AND AEROSPACE WORKERS, AFL–CIO

Director General
Pedro Vasquez Colmenares
Sub-Director General
Diafeide Paz Paredes

– 63 –

## EFFECTIVE DATE AND DURATION

This Agreement shall become effective June 1, 1976 and shall continue in full force and effect until May 31, 1978, and thereafter from year to year unless written notice or intended change is served by either party in accordance with the provisions of Section 6, Title 1, of the Railway Labor Act, as amended.

IN WITNESS WHEREOF, the parties have hereunto affixed their signature this 1st day of June, 1976.

AERONAVES DE MEXICO, S. A.

_____
C. M. Gutierrez, Manager U.S.A. & Canada

_____
Earl Kehoe, Industrial Relations Manager USA & Canada.

_____
Frederick Perry, Administrative Manager USA & Canada

INTERNATIONAL ASSOCIATION OF OF MACHINISTS AND AEROSPACE WORKERS

NEGOTIATING COMMITTEE:

_____
Frank Jimenez, Divisional Office & Accounting, Miami

_____
L. T. Faircloth, Grand Lodge Representative

Manny Rodriguez, Cargo Department, Miami

John Tague, Passenger Sales & Service New York

Miriam Montes, Telephone Sales and Service, Houston

Mary Holmes, Telephone Sales and Service, Los Angeles.

ARTICLE IV

CLASSIFICATION AND WORK REQUIREMENTS

(PGS. 3 & 4)

A–1

– 3 –

Union. In case of a consolidation or merger affecting the rights of employees covered by this Agreement, the Company will endeavor to use its best efforts to have the new or surviving company meet with the Union without delay and negotiate for proper provisions for the protection of employees seniority and other rights.

(C) Exceptions or modifications of this Agreement may not be made except by mutual agreement in writing between the Divisional Manager, U.S.A. and Canada and the representative of the International Union or their designee.

(D) The only interpretation of this Agreement which shall be considered valid and binding are those agreed to in writing by the designated International representative of the Union or his designee and the Divisional Manager, U.S.A. and Canada or his designee, which Agreement shall not be unreasonably withheld. If no such Agreement is reached the matter shall be dealt with in accordance with the Arbitration procedure of Article XIX of this Agreement.

ARTICLE IV
CLASSIFICATIONS AND WORK REQUIREMENTS

(A) In order to give all Aeromexico employees true system-wide seniority, the Company and the Union have agreed to consolidate the below listed job classifications as indicated hereunder the seniority accrued in those classifications will be recognized in those new consolidated positions as indicated below. A letter of agreement dated

April 9, 1976 is in the back of the contract and is made a part of this Agreement which clearly sets forth the consolidated job classifications.

(B) The following job classifications are covered by this Agreement:

Passenger Sales and Service Agent (Airport)
Passenger Sales and Service Supervisor (Airport)
Passenger Sales and Service Agent (City)
Passenger Sales and Service Supervisor (City)
Telephone Sales and Service Agent
Telephone Sales and Service Supervisor
Cargo Sales and Service Agent
Cargo Sales and Service Supervisor
Secretaries
Accounting Agents
Receptionist-Switchboard Operator Clerk
Stockroom-Messenger and Mail Clerk

The specific job description of each job classification is set forth as follows:

– 4 –

### PASSENGER SALES AND SERVICE AGENT–AIRPORT

The work of a Passenger Sales and Service Agent-Airport shall consists of the following duties:

Check in passengers and baggage, furnish air and ground transportation information to all customers. He shall assist passengers in arranging inter-line transfers, disembarking, boarding and connecting services announce arrivals and departures and check passengers at the gate.

He shall sell and issue tickets at the airport, answer telephones and provide information, make reservations at the airport, collect fares including excess baggage charges. He shall calculate and issue ticket refunds and prepare documents related to credit sales. He shall be responsible for the petty cash and accountable forms provided to him by the Company. The agent shall be responsible for all monies collected in any form along with the accountable forms and reports. He shall turn the money and above described documents over to the supervisor in charge of his shift. The supervisor shall give the agent a receipt for the money and documents received. He shall make all the sales reports from his work, prepare and transmit a transmittal form for tickets. He shall convey messages to passengers and other necessary agencies and process all lost and found articles and damaged baggage claims. The agent shall be capable of performing as agent in control of each flight. Such agent in control shall be responsible for effective utilization of seating capacity of the flight.

The agent shall clear documentation (mail, liquor, cargo and passenger's manifests and general declaration). He shall assist all arriving crew and passengers through government agencies. He shall prepare, compile and distribute lists of incoming and outgoing crew member, prepare aircraft pouch (Company mail, cargo and passenger's manifest, landing cards) for all departing flights. Prepare and deliver government forms (I–94's, I–92's and general declarations) after departure of aircraft to government agencies.

The agent shall arrange transportation and hotel accommodations for the flying staff during his tour of duty. He shall advise crew member of delays or other changes in schedules. The agent shall keep close liaison with dispatch flight, watch and advise the station manager or his designee of any anticipated flight delays or diversions. He shall

perform weight and balance on company aircraft, and he shall inform the mechanic of the fuel requirements. The agent shall order and record the total amount of necessary meals and shall obtain from the caterer a written meal account, then deliver the report to the supervisor.

He shall direct through ramp signals all incoming and outgoing aircrafts.

The agent shall be required to operate the teletype machine and cathode ray tube display units and associated equipment in order to perform his duties.

– 5 –

He shall report immediately any irregularities or malfunctions to the supervisor or his designee.

He shall perform routine duties pertaining to his job description. He must be familiar and have sufficient knowledge with tariffs applicable to the transportation he sells and with rules and regulations pertaining to such air travel, especially with CAB and IATA regulations, Company Rules and Regulations, Company Manuals, Booking Procedures and Government Travel Requirements. The Company shall be responsible for keeping all Passenger Sales and Service Agents-Airport familiar with any changes in the above mentioned manuals, rules and regulations by making such changes available to all agents, who will acknowledge by signature that they have read and understand the changes in the above mentioned manuals and rules and regulations. The agent shall be responsible for filing all revisions in the above described documents.

In addition to the above duties, at Phoenix and Tucson Stations the Passenger Sales and Service Agents-Airport shall perform the duties set forth in the job description of the Cargo Sales and Service Agent.

ARTICLE XVIII

GRIEVANCE PROCEDURES

(PGS. 44–47)

A–2

– 44 –

Paragraph D of this Article subject to the limitations as set forth herein.

(B) Severance pay shall not be paid in the event
 1. An employee is dismissed for cause;
 2. An employee resigns or retires;
 3. An employee refuses to work out his notice if requested to do so;
 4. A National Emergency arises which results in cessation of operations;
 5. An Act of God, revocation of the Company's operating certificate or certificates, grounding of a substantial number of the Company's aircraft for reasons of safety, a strike or picketing of the Company's premises causing a temporary layoff of the employees, acceptance of other unemployment with the Company or other circumstances beyond the Company's control.

(C) An employee recalled to work under the terms of Article IX of this Agreement after layoff who is again laid off under conditions that would entitle him to severance pay shall be entitled to the amount specified for his accumulated period of compensated service with the Company calculated from the date of his first recall and in accordance with Paragraph D of this Article, provided that severance pay shall not be paid twice for the same period of compensated service.

 1. An employee will not be required to take employment of a temporary nature as per Article IX, Par. X.

(D) Severance pay shall be paid on the basis of three (3) weeks for the first, second or third year of service and thereafter one (1) week's pay for each year of service up to and including the ninth (9th) year and thereafter on the basis of two (2) weeks per year up to a maximum of fifteen (15) weeks for twelve (12) years.

(E) In the event of the termination of employment by layoff or for any other reasons other than a strike by the employees of the Company, the amount, if any, to which an employee would otherwise be entitled under paragraph (D) above shall be paid in full by no later than the regular payroll date following the termination of his employment. Such severance pay shall be made in a lump sum. All final checks paid hereunder shall include a breakdown of the components of the paycheck.

ARTICLE XVIII
GRIEVANCE PROCEDURE

(A) The representation for the effective handling of grievances and disputes between the parties to this Agreement shall be:

 1. The Union Will be represented by no more than one properly designated Shop Steward at each facility by each work classification. The

– 45 –

Steward will be empowered to settle all local grievances not involving changes in policy or the intent and purpose of this Agreement.

 2. The Company will be represented by an authorized representative at each facility, who will be empowered to settle all local grievances not involving changes in Company policy or the intent and purpose of this Agreement.

 3. The Company and the Union will at all times keep the other party advised through written notices of any change in the respective party's authorized representative.

 4. The International Union Representative or the General Chairman or their authorized representative may enter the Company's premises during working hours for the purpose of adjusting disputes and/or observing working conditions, upon informing the management representative then in charge of that section, so long as such visit does not interfere with the Company's operations.

 5. Nothing in the grievance procedure shall prevent an employee from discussing with his immediate Manager any problem pertaining to his work, but there shall be no grievance until it has been reduced to writing.

 6. If a grievance is not presented or appealed in writing within the time provisions of this Article, it shall not receive further consideration except when said time provisions are extended by mutual agreement between the Company and the Union.

 7. Failure upon the part of the Company to issue its decision within the time stipulated shall be treated as a denial of the grievance, allowing the grievant to appeal to the next step of the grievance procedure provided for herein.

 8. The Union or an employee covered by this Agreement who believes that the existing rates of pay, rules, or working conditions expressed in this Agreement

have not been properly applied or interpreted as to him, must, within seven (7) calendar days of the date of the alleged violation, present his grievance in writing, to his immediate Manager or designee, stating specifically which provision or provisions of this Agreement have been allegedly violated. At that time, an attempt to resolve the grievance shall be made. If the grievance is not resolved, the Manager or his designee shall evaluate the grievance and render a decision in writing within seven (7) calendar days after receipt of the said written grievance.

9. If the written grievance is not settled in this first step, the employee, within seven (7) calendar days of the date of the decision, may appeal the decision in writing to the next immediate Manager who shall render a decision in writing within seven (7) calendar days of the date of receipt of the employee's appeal. This step shall not apply where the District Manager served

— 46 —

as the immediate Manager under Paragraph 8, in which event the grievance shall be submitted under Paragraph 10.

10. If the written grievance is not settled on a local level, then the written grievance shall be mailed by the local Company Manager to the Divisional Manager, U.S.A. and Canada, to the Division Headquarters office located at 8400 N. W. 52nd. Street, Suite 100, Miami, Florida 33166. The Shop Steward shall mail a written copy of the grievance to the General Chairman of the International Association of Machinists and Aerospace Workers, Airline District 146, 1930 Hinton Drive, Irving, Texas 75061. A written grievance must be mailed within seven (7) calendar days after written decision has been made.

11. All written grievances not disposed of on a local level by the Shop Steward and the Company Manager shall be taken up by the Company Union Committee, which shall meet once every month. The Committee shall consist of two (2) Company representatives and two (2) Union representatives. The Committee shall take a vote as to its decision to the grievance and a majority vote shall be the decision of the Committee and shall be final and binding upon the parties. In the event the Committee cannot reach a majority decision and is deadlocked, then either party, namely the Company or the Union, may request as a matter of right to submit the grievance to an Arbitrator in accordance with arbitration procedure hereinafter set forth in Article XIX.

12. It is understood and agreed that the Company has the right to discipline or discharge an employee for just and sufficient cause with ten (10) days of learning of any evidence of wrong doing on the part of such employee.

13. No employee under the terms of this Agreement, who has been in the service of the Company for more than ninety (90) days will be disciplined to the extent of loss of pay, suspended or discharged without first having the benefit of a fair and impartial meeting with a Union official present, except employees involved in stealing, under the influence of drugs and/or alcohol, sabotage, fighting on the job, or refusal to follow a direct order.

14. In the event of discharge or suspension, a meeting will be held within seven (7) days from the date of the written notice of the charge or charges, between representatives from the Company and the Union. The management representative presiding at the meeting shall be one other than the management representative preferring the charge or charges. At this meeting, the employee shall be present and will be represented by an authorized Union representative. He will be permitted to hear all evidence against him and with his representative question all witnesses and/or statements against him. Reasonable opportunity will be allowed employees to secure the presence of their representatives. A decision will be issued in writing within seven (7) days after the close of the meeting and copies shall be furnished to the Union.

15. Any copy of written statements, or of a stenographic report which may be developed at the meeting, will be furnished to the Company and the Union.

16. If, as a result of the meeting, the initial action is sustained the employee or his Union representative may file a written grievance.

17. The Union shall be notified of all such meetings and shall be privileged to participate in them. The Company will advise the Union of any action to be taken in this regard.

18. For purposes of applying the time limits set forth herein.

(a) a grievance shall be deemed "presented", an appeal shall be deemed "made" or "filed", and a decision shall be deemed "rendered" when it is hand delivered to the proper recipient or when it is mailed by certified mail, return receipt requested, in properly addressed, stamped envelope. When a grievance is hand delivered, the Manager must acknowledge receipt by signing and dating and returning one copy to the grievant. When an answer is hand delivered by the Manager, the grievant must acknowledge receipt by signing and dating and returning a copy to the Manager.

(b) The day upon which an alleged act occurs shall not be counted, the first day upon which the grievance is "presented", the appeal "made" or "filed" and the decision "rendered", as defined above, shall be counted and shall end at midnight of that day.

19. Mutual agreement between the Company and the Union for extension of time limitations governing the grievance procedure or any other article requiring time limitations will not be considered a violation of the terms of the Agreement; however, said extension of time limitations shall not be unreasonably withheld by either party.

20. Where an employee's record during a one (1) year period demonstrates that no disciplinary action has been taken against him by the Company and no letter of reprimand has been placed in his personnel file, letters of reprimand placed in the file prior to the one (1) year period will be removed.

21. Stewards shall be permitted to process necessary grievances and endeavor to adjust employee's complaints with management during working hours.

ARTICLE II–(E)

SCOPE OF THE AGREEMENT

(pg. 2)

A–3

– 1 –

AGREEMENT
BY AND BETWEEN
AERONAVES DE MEXICO, S. A. AND
INTERNATIONAL ASSOCIATION OF MACHINISTS AND
AEROSPACE WORKERS, AFL–CIO

This Agreement is made and entered into the 1st day of June, 1976, in accordance with the provisions of Title II of the Railway Labor Act, as amended, by and between **AERONAVES DE MEXICO, S. A.,** (hereinafter referred to as the Company), and **INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORK-ERS, AFL–CIO** (hereinafter referred to as the Union).

ARTICLE I
PURPOSE OF AGREEMENT

(A) This Agreement is entered into, under the terms of the Railway Labor Act, as amended, in the mutual interest of the employees and of the Company to promote the safety and continuity of air transportation, to further the efficiency and economy of operations, and to stabilize employment under reasonable hours, rates of pay and working conditions. It is recognized by this Agreement to be the duty of the Company, the Union and the employees to cooperate fully, both individually and collectively, for the advancement of said conditions for the attainment of these purposes.

(B) To further these purposes, the Company or an International Representative of the Union or his designee may request a conference at any time to discuss and deal with any general condition that may exist at Company locations.

(C) The Company agrees that no employee covered by this Agreement will be interfered with, restrained, coerced or discriminated against by the Company, its officers or agents, because of membership in or lawful activity on behalf of the Union.

(D) It is understood that wherever in this Agreement employees are referred to in the male gender, it shall be recognized as referring to both male and female employees.

## ARTICLE II
### SCOPE OF THE AGREEMENT

(A) The Company recognizes the Union as the sole and exclusive bargaining agent for the employees of the Company based in the United States, its territories and possessions, who comprise the crafts and classes of clerical, office, fleet and passenger service employees, as certified by the National Mediation Board in case No. R–4502 on August 13, 1975 subject to the exceptions noted in Article XXIX of this Agreement.

(B) All work performed by the Company, as described in the classifica-

– 2 –

tion and work requirements in Article IV of this Agreement, is recognized as coming within the jurisdiction of the Union and is covered by this Agreement. Unless emergency conditions prevail, Management or other individuals not covered by this Agreement will not perform duties assigned to employees covered by this Agreement.

(C) The Company agrees that all positions and work performed by the employees covered by this Agreement and in effect on the date of signing of this Agreement belongs to the employees covered hereby, and that whenever the work is performed in the United States, its territories and possessions, it will be performed by Aeronaves de Mexico, S. A. employees covered by this Agreement, except it is understood the Company reserves the right to continue contracting out work historically contracted out prior to the effective date of this Agreement and when opening any new station providing that the work does not exceed four (4) hours per day per classification in any five (5) day week.

(D) In the performance of their duties, employees covered by this Agreement shall be governed by Company rules, regulations and orders issued by properly designated authorities of the Company in English, providing such rules, regulations and orders are not in conflict with the terms and conditions embodied in this Agreement. No new rules or regulations will be considered effective until copies have been furnished to the Union District office and to the shop steward at the location involved and conspicuously posted in the working areas at least seventy-two (72) hours prior to the effective date. The Company shall be responsible for keeping all employees familiar with any changes in the above mentioned rules and regulations by having all employees acknowledge by signature that they have read and understand said changes.

(E) The management of the Company and the direction of its employees, including, but not limited to, the establishment of working conditions, the hiring, scheduling, promoting, demoting, and rehiring of employees, the suspending, the discharging, or otherwise disciplining of employees and the laying off and calling to work of employees in connection with any reduction or increase in working forces, are the exclusive functions of management to the extent that any of such matters are not otherwise covered or provided for in this Agreement and provided that in the exercise of such functions, the management shall not violate any provisions of this Agreement.

## ARTICLE III
### STATUS OF AGREEMENT

(A) This Agreement and any appendices or supplements thereto, supersede any and all Agreements now existing or previously executed between the Company and any Union or individual, affecting the crafts and classes of employees covered by this Agreement. All prior agreements are null and void.

(B) It if further understood and agreed that all provisions of this Agreement shall be binding upon the successors or assigns of the Company and the